# EXHIBIT 10

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.                    CASE NO: 1:20-cr-00033-ECM-SMD-1

LEROY THOMAS JOYNER, JR.,

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DETENTION HEARING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BEFORE THE HONORABLE STEPHEN M. DOYLE, UNITED STATES MAGISTRATE JUDGE, at Montgomery, Alabama, on Wednesday, June 10, 2020, commencing at 10:02 a.m.

APPEARANCES

FOR THE GOVERNMENT:        Mr. Russell T. Duraski
                           Assistant United States Attorney
                           OFFICE OF THE UNITED STATES ATTORNEY
                           131 Clayton Street
                           Montgomery, Alabama 36104

FOR THE DEFENDANT:         Mr. Stephen P. Ganter
                           FEDERAL DEFENDERS
                           817 South Court Street
                           Montgomery, Alabama 36104

Proceedings reported Stenographically;

transcript produced by computer

EXAMINATION INDEX

SHAJUANA MCLENDON

    DIRECT                                                    6
    CROSS                                                    42
    REDIRECT                                                 53
    RECROSS                                                  55

HEATHER HOLT-WHELAN

    DIRECT                                                    58
    CROSS                                                    74

TERRENCE MARSHALL

    DIRECT                                                    89
    CROSS                                                    97

* * * * * * * * * * * * * *

(The following proceedings were heard before Honorable Stephen M. Doyle, United States Magistrate Judge, at Montgomery, Alabama, on Wednesday, June 10, 2020, commencing at 10:02 a.m.)

(Call to order of the Court.)

THE COURT: This is United States v. Leroy T. Joyner, Criminal Number 1:20-cr-33. We're here this morning for a detention hearing. The detention hearing is being conducted via video teleconference. The defendant has consented to have his detention hearing conducted in this manner, which is

Document Number 7 on the dockets. I want to check communications.

First of all, Mr. Ganter, can you see and hear me?

MR. GANTER: I can, Your Honor.

THE COURT: And, Mr. Duraski, can you see and hear me?

MR. DURASKI: Yes, sir, Your Honor, I can.

THE COURT: And, Mr. Joyner, can you see and hear me?

THE DEFENDANT: Yes, sir, but I can't see my attorney.

THE COURT: Can you hear Mr. -- well, Mr. Ganter is currently muted, I see.

Do you want to check communications with your client, Mr. Ganter?

MR. GANTER: I can see Mr. Joyner.

THE DEFENDANT: Yeah. I -- I just can't see him.

THE COURT: All right. Do you consent to proceed with just audio?

THE DEFENDANT: Yeah, as long as I can hear him, that's fine, sir.

THE COURT: Okay. And, Ms. Baxter, can you see and hear me?

COURTROOM DEPUTY: Yes, sir. Your Honor, I would also like to let you know that we do have the agent, Ms. Whelan, on the line with us as well.

THE COURT: Okay.

And, Mr. Marshall, can you see and hear me?

MR. MARSHALL: I can, Judge.

THE COURT: And, Ms. Whelan, can you see and hear me?

MS. WHELAN: I can, Your Honor.

THE COURT: All right then. As I stated, we're here for a detention hearing. As an initial matter, has -- have both Mr. Ganter and Mr. Duraski received a copy of the Pretrial Services Report and had an opportunity to review it?

MR. DURASKI: Your Honor, I have received it and reviewed it.

MR. GANTER: I will note that, Your Honor, I did receive it later in the afternoon. I have not had an opportunity to refer that -- review it with Mr. Joyner, however.

THE COURT: Okay. Is there an objection to me making the -- a copy of the Pretrial Services Report an exhibit under seal?

MR. DURASKI: No objection.

MR. GANTER: Yes. Yes, Your Honor, there is an objection. I know that normally it does -- normally it comes in when the probation officer testifies. Let me just ask that if it's going to be offered and then subsequently admitted, it be offered and admitted at that time when Mr. Marshall testifies.

MR. DURASKI: I can't hear the Judge. I cannot hear the Judge.

MS. FREEMAN: Judge, you're on mute.

COURTROOM DEPUTY: There you go, Judge.

THE COURT: Mr. Ganter, I've considered your objection, and I will wait to admit the report when Mr. Marshall testifies.

The offense charged -- this is a rebuttable presumption of detention; is that correct?

MR. DURASKI: That is correct, Your Honor.

THE COURT: And, Mr. Ganter?

MR. GANTER: That's correct, Your Honor.

THE COURT: Okay. And because you bear the burden, I'll allow you to go first if you wish to.

MR. GANTER: Yes, Your Honor.

At this point, we'd like to call Ms. McLendon to the stand, please.

SHAJUANA MCLENDON,

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

THE COURT: And, Ms. McLendon, I just want to instruct you, you're aware that this proceeding is a court proceeding just as if we were present in the federal courthouse, and you're under oath just the same as if we were in federal court today, present in the courthouse, rather than via VTC?

THE WITNESS: Yes, sir.

THE COURT:   You may proceed.

MR. GANTER:   Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GANTER:

Q.   Ms. McLendon, can I get you to spell your first name and last name for the record.

A.   S-h-a-j-u-a-n-a M-c-L-e-n-d-o-n.

Q.   And, ma'am, where do you currently reside?

A.   Clayton, Alabama.

Q.   And, ma'am, what is it -- well, where do you -- where are you employed?

A.   With Barbour County School Systems.

Q.   And do you know Leroy Joyner?

A.   Yes, sir.

Q.   And how do you know him?

A.   He came to our school and started teaching tennis lessons, and he picked my daughter up as one of his students.

Q.   Okay.  Well, let's back up.  When did he come to your school and start teaching tennis lessons?

A.   Maybe about seven years ago.

Q.   So that would have been 2013 or so?

A.   Yes, sir, I believe so.  Somewhere along in there.

Q.   And what was the name of his -- you said he came to your school.  Did he come by himself, or was he part of an organization?

A.    Part of an organization.  Him and his daughter.

Q.    So he and his daughter?

A.    Yes.

Q.    And his daughter who?

A.    Spirit.

Q.    Spirit.  And did this organization have a name?

A.    Yes, sir.  I think it was Grassroots.

Q.    Okay.  And did you -- did your daughter start participating in Grassroots?

A.    Yes.

Q.    And how would she sort of participate?  I guess I'm trying to find out what was going on here.

A.    Once he picked her up as a team member, we started going to Ozark, Alabama, and she was getting lessons there on the tennis court and participating in team tennis events where other students that he had, they would play each other tournaments.

Q.    Okay.  So this wasn't just one isolated event at Barbour County?  This involved more locations?

A.    Yes.

Q.    Okay.  And what locations did it involve?

A.    We were in Ozark, Alabama; Troy, Alabama; Enterprise, Alabama.

Q.    Okay.  And how long did this go on, this sort of going around playing tennis and things like that in (audio

disruption)?

A.   When we first started, I guess, about a year.

COURTROOM DEPUTY:  Mr. Ganter?

THE COURT:  Yeah, I've lost Mr. Ganter.

COURTROOM DEPUTY:  All right.  Hang on for me.  Let's give him a second to log back in.

THE COURT:  I've got his video, and his audio is showing mute on my screen.

COURTROOM DEPUTY:  Okay.  Let's give him a second.

THE COURT:  Okay.

(Brief pause at 10:11 a.m.)

COURTROOM DEPUTY:  Mr. Ganter, can you hear us okay?

MR. GANTER:  Yeah, I can hear you.

Q.   (Mr. Ganter, continuing:)  I think that we got interrupted at the point where I was asking about certain locations where Grassroots would participate?

A.   Ozark, Alabama; Troy, Alabama; Enterprise, Alabama.

Q.   Okay.  Now, what was your involvement with Grassroots?

A.   I was considered to be the team mom.

Q.   And how long were you in that sort of team-mom capacity?

A.   Pretty much ever since HaLeigh was included on the team.

Q.   And was that going back to about 2013?

A.   Yes.

Q.   Okay.  And as a team mom, did you get to know and be around the team members?

A.   Yes.

Q.   Okay.  And what would some of your duties as a team mom include?

A.   Feeding the children; clothing, making sure their clothes were fitting.  Like whenever we went to the different tournament sites, making sure that everybody was there, making sure everybody was ready for their match when their match time came up.

Q.   Okay.  And so you had a lot of interaction with the team members?

A.   Yes, sir.

Q.   Okay.  Now, were you always present for the matches?

A.   Yes, sir.

Q.   Okay.  And would you say that your relationship with the team members was close?

A.   Yes, sir.

Q.   Now, these team members, did they con- -- they consisted of teenagers, or what were the age groups?

A.   Not at that time.  They were more or less like -- I think my daughter might have been the oldest one.  She was 13, and the rest of the kids were under 13.  Ages, I think, maybe like 8 -- 8 to 13.

Q.   Okay.  And did Grassroots have a mission while they were going out and teaching tennis?

A.   Yes.  Because he wanted to start the program for

underprivileged kids to expose them to a new environment that we otherwise had no -- no exposure to.  My daughter --

Q.   Well, let me ask --

A.   -- didn't know about tennis.  So -- until he came.

Q.   Okay.  So you were saying your mother -- your daughter had not played any tennis until Grassroots showed up?

A.   Right.

Q.   Okay.  And did she take a liking to tennis?

A.   Yes, sir.  As a matter of fact, she's still trying to get on a team and play.

Q.   Okay.  Now, did it also have girls and boys?

A.   Yes, sir.

Q.   Who else did -- you said that when you first came in contact with Mr. Joyner, he was with his daughter Spirit.  Were there other folks that helped out as well?

A.   Yes, sir.  His wife and -- Dodie (phonetic) and his other two daughters, Cookie and Melody.

Q.   Okay.  Now, how were you getting funding for the -- Grassroots?

A.   He had people that would donate tennis rackets, clothes, supplies that we needed, and then also the parents.  We also paid for tennis lessons when we got -- well, not for tennis lessons but to go to the tournaments.  We would pay for the tournaments.

Q.   My understanding with tennis is it requires a lot of

practice; is that correct?

A.   Correct.

Q.   I want you to take me through sort of a normal day of Grassroots when a player would be playing or -- or practicing and how you would see that.

A.   When we first started, we would basically come in on Saturdays.  And I live in Clayton, so we were having practice in Ozark.  So we would all meet there in Ozark at the courts there, and he would go through sessions for about two hours maybe and practice with us.  He had his family there.  Dodie was there.  Spirit was there.  Cookie and Melody were there.

Q.   And this would be two hours?  Was this something that was done every day, or was this just something that was done on the weekends?

A.   When we first started, it was just on the weekends.

Q.   Okay.  And then the pace picked up over time; is that correct?

A.   Correct.

Q.   Okay.  After that pace picked up, would you say that the practices and the practice schedule became more intense?

A.   Yes, sir.

Q.   And describe that sort of intensity of picking up and getting busier.

A.   At that particular time is -- we pulled my daughter out of school.  He started the homeschool program for the remaining

players that we had. And we would come to Ozark and practice every day, and we would also help them with their schoolwork at that time particular time as well.

Q. And obviously the parents of these children or these teenagers and all these folks, they consented; correct?

A. Yes, sir.

Q. Okay. And you consented; is that right?

A. Yes, sir.

Q. Okay. Now, talk to me -- like, after they got pulled out and they were in homeschool, tell me what a day of practice and all of that might look like.

A. We would get to Ozark about 8:00 in the morning, and we would get everything pulled out of the vans, get everything set up, and they would start their routine workouts. Spirit would work with some. Coach Dodie would work with some. If Cookie or Melody -- whichever one was there -- they would work with some of the students. And then they would work for awhile, and then they would take a break for lunch. And then they would go back on the court, work for a while, and then take another break and do homework.

Q. So essentially this was an all day thing; is that correct?

A. Correct.

Q. Okay. And so they were either -- during the day -- in school or practicing tennis?

A. Yes.

Q.    Okay.  And there was more -- how many folks are we talking about?  How many people are we talking about?

A.    I think at that time about eight.

Q.    And that would be eight students?

A.    Yes.

Q.    I don't want you to call out their names, but do you remember the eight?

A.    Yes, sir.

Q.    Okay.  And was your daughter one of the eight?

A.    Yes, sir.

Q.    Okay.  I want to ask you about -- were there some of these students that came to live with Mr. Joyner?

A.    Yes, sir.

Q.    Can you tell the Court about that situation.

A.    From my understanding, because of the living situation with the mother and what she had going on -- drugs were involved at the time -- DHR was about to take the children from her, and the school called --

MR. DURASKI:  I'm going to object to her speculating about what DHR was going to do.  There's been no basis made for her foundation (indiscernible) parent using drugs or DHR's involvement.

MR. GANTER:  Your Honor, if I may respond?

THE COURT:  (No response.)

MR. GANTER:  Your Honor, I can't hear you.

THE COURT: Yes, Mr. Ganter, please respond.

MR. GANTER: I just did lay the foundation that she was the team mom, that she interacted with these folks every day. Certainly she would be able to testify regarding the (audio disruption).

THE COURT: The objection is overruled.

COURTROOM DEPUTY: Your Honor, Mr. Ganter is frozen.

THE COURT: Ms. Baxter, can you try to get him back?

COURTROOM DEPUTY: Yes. He's going to have to exit out and come back in. So let's just give him a second here.

(Brief pause at 10:21 a.m.)

THE COURT: Ms. Baxter?

COURTROOM DEPUTY: Yes, sir?

THE COURT: I've muted my camera. I'm going to unmicrophone, and if you can let me know when the parties are ready to proceed, I'll come --

COURTROOM DEPUTY: Yes, sir, I sure will.

THE COURT: So we're in recess.

COURTROOM DEPUTY: Yes, sir.

(At which time, a recess was taken at 10:25 a.m.)

THE COURT: Mr. Ganter, are you willing to proceed from the room with your client?

MR. GANTER: Well, my client is over at the county jail, Your Honor.

THE COURT: Oh. I'm sorry.

MR. GANTER: The witness is here in our office.

THE COURT: And if you're willing to proceed from there -- Mr. Duraski, do you have an objection on that? The Court has no objection.

MR. DURASKI: I have no objections, Your Honor.

THE COURT: Then why don't we proceed in that manner. And, Mr. Ganter, I have overruled the Government's objection that was before the Court, and you may proceed with your direct examination.

MR. GANTER: Very well, Your Honor.

And I guess I'm going to have to speak up so everybody can hear me.

THE COURT: And the Court can hear you just fine.

MR. GANTER: Very well.

Q. (Mr. Ganter, continuing:) Okay. Before that interruption, Ms. McLendon, I was asking you about, wasn't there an occasion where some of the students came to live with the Joyners?

A. Yes, sir.

Q. And do you know their initials?

A. Yes, sir.

Q. And what are those initials?

A. S. S., D. S., and M. S.

Q. Very good. And how old were they when they came to live there? Do you remember?

A. No, sir, I don't.

Q. Were they juveniles?

A. Yes.

Q. And what were the circumstances of how they came to live with the Joyners?

A. They got a call from the school they were attending that DHR was coming to get them because of a situation with their mother, and so Coach Dodie and Coach Leroy went to the school and picked them up. They later met with the mother and I guess discussed, you know, what they were going to do about them, and she agreed to let Leroy and Dodie keep them because at the time she couldn't take care of them.

Q. Okay. So the mother consented, essentially, to allowing Dodie and Leroy to take custody of these children; is that correct?

A. That's my understanding.

Q. And where did they live?

A. At that time, they were living in Ariton, Alabama.
Coach Leroy?

Q. Yes.

A. Yeah. In Ariton, Alabama.

Q. So they were -- and were they all involved in the tennis program?

A. Yes.

Q. And it's your understanding that if the Joyners had not

stepped up, those kids would have gone off to DHR?

A.    Yes, sir.

Q.    And for foster care possibly?

A.    Yes, sir.

Q.    I want to ask you about discipline.  We've seen some paperwork about corporal punishment?

A.    Yes, sir.

Q.    Do you know anything about that?

A.    Yes, sir.

Q.    And what do you know about it?

A.    It was not something that was done every day.  It was -- he would discipline them according to offenses they had done leading up to the paddling, like horseplaying on the court, not doing homework.  But like I say, it wasn't every day that they would get a paddling.

Q.    Okay.  Now, did this involve the three students that were living with the Joyners?

A.    Yes.

Q.    Did this involve an individual with the initials of C. S. who is the alleged victim --

A.    Yes.

Q.    -- in this case?

Did all of these individuals' parents consent to the discipline?

A.    Yes, sir.

Q.   Did you consent to discipline of your own daughter?

A.   Yes, sir.

Q.   And what I mean "discipline," I mean corporal punishment.

A.   Yes, sir.

Q.   There's been some documentation that there was paddling done with a nail.  Do you -- a paddle with a nail in it.  Are you familiar with anything like that?

A.   No, sir.

Q.   So it was a standard paddle from way back in the day; is that --

A.   Yes, sir.  Like, what the schools use.

Q.   Did you see anything that you would have considered excessive?

A.   No.

Q.   Now, as the team mom, would the folks come and -- the students come and confide to you?

A.   Yes, sir.

Q.   Would they complain?

A.   Yes, sir.

Q.   What was some of the complaints that they had?

A.   They didn't like the food that we would serve them at lunch some days.  They didn't like being out in the heat because we practiced year-round.  They didn't like being out in the cold.  Sometimes -- because Leroy would make them run as part of their routine -- they didn't like to run.  They didn't

like to do schoolwork some days.

Q.   Did any of them come and complain about the discipline?

A.   No, sir.

Q.   Did any of them ever suggest to you that they were being abused in any way?

A.   No, sir.

Q.   I want to ask you if you know a woman named Shelly Sanders?

A.   Yes, sir.

Q.   Okay.  Before we get there, though, I do want to ask you about -- obviously, these teenagers had cell phones; is that correct?

A.   Yes, sir.

Q.   Was there a Grassroots policy in dealing with the cell phones?

A.   (Indiscernible.)

Q.   Would they inspect them?

A.   No.

Q.   How were assignments given to the students?

A.   They all had email accounts set up by Coach Dodie, and that's how that -- they would get their schoolwork through their email accounts.  And if there was something one of them didn't understand, they would take the phone to either Spirit or Coach Leroy, and they would, you know, go through and help them find the lesson or go through and help them with the

lesson and, you know, show them how to get it back to Dodie or whatever was needed to be done.

Q.   So the email accounts and -- would the students access their email accounts on the Internet using their phones?

A.   Yes.

Q.   Okay.  Now, you indicated that you do know a woman named Shelly Sanders; is that correct?

A.   Correct.

Q.   And that's C. S.'s mother; is that right?

A.   Correct.

Q.   Now, I want to take you back to when you got on the team. Was C. S. already on the team?

A.   Yes, sir.

Q.   So she would have been on the team as early as 2013; is that correct?

A.   Yes, sir, I believe so.

Q.   Now, was she one of the students that would practice frequently?

A.   Yes, sir.

Q.   So that schedule that you laid out earlier in your testimony about someone who would start at 8:00 and then have their school -- practice and then have school, then a lunch, then a -- practice or school for the entire day, that was C. S.; is that correct?

A.   Correct.

Q.   So -- and I'm assuming that when these -- well, you tell me.  When these students were together, they were all together; right?

A.   Yes.

Q.   Now, when did you first encounter C. S.?

A.   Our first practice on a Saturday.

Q.   And that would have been back in 2013 when you were first exposed to Grassroots?

A.   Yes, sir, I believe so.

Q.   Okay.  Now, you were a team mom, and you've described that you were always involved.  Was Shelly Sanders -- did she have that level of involvement like you?

A.   No, sir.

Q.   Did she come to the tournaments?

A.   Yes, sir, she did come to some of the team tournaments.

Q.   Some team tournaments?

A.   Uh-huh (nodding head).

Q.   Now, when those tournaments started, describe to the Judge how they -- how it was sort of formed.

A.   The players that we had there in Ozark -- he also had players in Troy, players in Enterprise.  So if we were doing a team tournament in Ozark, the players from Troy and Enterprise would come to our court there in Ozark, and the players would play each other depending on their age level.

Q.   So Grassroots students were playing Grassroots students

depending upon their specific location?

A.   Yes, sir.

Q.   Okay.  Was there a change — or was there a time when that sort of changed?

A.   Yes, sir.

Q.   And can you explain to the Court how that evolved a little bit.

A.   I think that that lasted for about a year and -- because of their level of play, because Leroy felt like they were ready to go out on the road and start playing in tournaments against other children in -- in the State of Alabama.

Q.   And the folks that were determined to go out on the road, were those the good players or the better players of the group?

A.   It was all the players.

Q.   All the players?

A.   Uh-huh (nodding head).

Q.   Was C. S. one of those players that would go out on the road?

A.   Yes, sir.

Q.   And Shelly Sanders, C. S.'s mother, would consent to this obviously; correct?

A.   Yes, sir.

Q.   Now, individuals who would go out on the road, would they have to pay for it or pay for expenses?  How was that funded?

A.   They were -- Coach Leroy took care of hotel, and we paid

the tournament fees.

Q. And these tournaments, who was holding them? Was this, like, a national organization?

A. Yes.

Q. Okay. And do you know the name of that national organization?

A. No, sir, I don't.

Q. Okay. But it wasn't just Coach Leroy calling somebody up in some other city and they're just getting together --

A. No.

Q. -- correct?

A. No.

Q. This was an organized event?

A. Yes, sir.

Q. How often -- how far in advance would you get notice that you were going to go off to a tournament or you were going to participate in a tournament?

A. At least a month in advance. Because they had a schedule -- because once they went to this -- this organization's website, they saw the tournament that we could get in, and so they would give -- call a meeting with the parents and discuss about going to the tournaments. So they would do that at least a month in advance to give the parents time to get money together.

Q. Okay. Did C. S. often participate in these?

A.  Yes, sir.

Q.  Okay.  Was C. S. close to your daughter?

A.  Yes, sir.

Q.  At any point in time, did C. S.'s parents ever object to traveling?

A.  Yes, sir.

Q.  And when did that happen?

A.  When we went to Kentucky.  I don't remember the year.  It was during Thanksgiving.  And it wasn't actually her parent.  It was her grandparent, her grandmother.  And because it was during Thanksgiving, she was having a fit because she wanted C. S. at home with the family.

Q.  But this was the grandmother?

A.  Yes.

Q.  Not Shelly Sanders?

A.  Right.

Q.  Now, would there be times where there were back-to-back tournaments?

A.  Yes, sir.

Q.  And kind of explain what would happen to the students when y'all had these back-to-back tournaments.

A.  We would load them up in the vehicles and take them down the road, wherever we had to go, to the tournament.

Q.  Okay.  And then after the tournament, where would you go?

A.  We would come back home.  Because at that particular time,

when we first started on the road, we didn't travel more than two to three hours.  So after the tournament was over, we always came straight back home.

Q.   Okay.  Was there a time when you didn't come back straight home?

A.   Yes, sir.

Q.   And tell the Court about that.

A.   When we went to Kentucky -- that first time we went out on the road, we went to Kentucky.  We were gone for about four days.  We stayed at the Extended Stay there in Kentucky.  It was during our Thanksgiving tournament.

Q.   Uh-huh.

A.   And myself and the kids, we stayed in a room together.  At that time, Spirit and Coach Leroy were the only other two adults with us, and they slept out in the van.

Q.   Okay.  Now, you indicated that Coach Leroy and someone else slept in the van; is that correct?

A.   Correct.

Q.   All right.  Was that standard for Coach Leroy to sleep in the van?

A.   Yes, sir.

Q.   Did you ever see Coach Leroy sleeping in any of the hotel rooms on these trips?

A.   (No response.)

Q.   Well, let me ask you this:  Did you ever see him sleeping

with anyone other than family members --

A.   No.

Q.   -- in the --

A.   No, sir.

Q.   So he was never in a room with a student that you saw him where he was sleeping for the night?

A.   No.  No.

Q.   Was -- in your interactions with Coach Joyner, was he cognizant of the perception of an older man and maybe teenage girls and that he was interacting with -- cognizant of a perception -- did he want to give off the wrong perception or anything?

A.   Oh.  No.

Q.   Okay.  Yesterday you indicated by example -- by way of example that he would not do anything or he did not -- he was careful not to draw attention to that?

A.   Right.

Q.   Can you explain to the Court what you meant by that.

A.   He was trying to show HaLeigh a technique, and HaLeigh wasn't understanding what he was meaning.  So he walked up to her with his racket and he told her to hold her hand out with her racket in her hand, and he would motion how he wanted her to move the racket.  And so after practice, I questioned him about it.  I was -- I said, "Why didn't you just go up to her and put your hand on her wrist and move the racket for her to

show her?"

He said, "That is a pet peeve of mine. I do not touch the students, especially the female students."

Q. Okay. And you saw no problem with that; is that correct?

A. Correct.

Q. But he did?

A. Yes, sir.

Q. Was there another thing that he took into consideration if you would remember -- if you can remember?

A. I know he did not talk to especially female students. If he were, you know, talking with them after practice or whatever, he never talked to them by himself. Either I was there or Spirit was there or if Coach Dodie was around. There was also another parent that was involved as well; and, you know, she would be there whenever he would talk to a student.

Q. Okay. I want to ask you, did you ever -- are you familiar with any sort of meeting that Coach Joyner would have in a van with students after practice?

A. Yes, sir.

Q. Would he do this alone, or would he do it with a group of students?

A. Sometimes he would do it with a group of students, but if he did individual one-on-one, either myself or Spirit would be there.

Q. Did you ever see him with C. S. alone in a van?

A.   No, sir.

Q.   I want to ask you, did you as the team mom ever hear anything from the other students regarding what you thought was inappropriate or improper conduct?

A.   Yes, sir.

Q.   And do you know who they were complaining about?

A.   Yes, sir.

Q.   And who were they complaining about?

A.   C. S.

Q.   What specifically were they complaining about C. S.?

A.   For one, she was a spoiled brat because she wanted all the attention.  Whenever Coach Leroy or especially Spirit spent too much time with another student, she would always do something to try to get the attention back on herself.  It would disrupt the class.  They would have to stop class for a period of time to try to, I guess, calm her down to make her understand she's not the only one on the team that needs help.  She had been there the longest, and these other kids, you know, needed more help than she did, and she couldn't understand that.  And so she would get upset about it.  She would throw tantrums about it.  She would do whatever she could do to get the attention back on her, and the kids started to complain about it -- the rest of the team would complain about it because it was taking away from their time.

Q.   Did she -- did you hear her say things that you thought

were inappropriate?

A.    Oh, yes, sir.

Q.    Can you describe that to the Court.

A.    There was one conversation, we were headed to a tournament and -- I don't even remember how the conversation got started -- but the one thing she did say -- we were talking about black guys, and she made the statement -- somebody asked her "Why would you want to date a black guy?"

And she made the comment "Oh.  Because I" -- "I know how black guys are, and I want a black guy with a big, black dick." Those were her words that she said.

Q.    And you heard that?

A.    I heard that.

Q.    Did you say anything to her?

A.    Yes, I did.

Q.    And what did you say?

A.    I told her that was very inappropriate for her to say. She's a young lady, and young ladies do not speak in that manner.

Q.    Were these things uncommon for her to say?

A.    No, they were not.

Q.    Let me ask you about that November 2018 time period. There was a falling-out between Shelly Sanders and Grassroots; is that correct? -- somewhere around there?

A.    Yes, sir.

Q.   Okay.  Do you know why there was a falling-out between Shelly Sanders and Grassroots?

A.   I believe it was the incident that happened at the laundromat.  It involved her son Evan.  Evan was also a part of the homeschool.  Even though he didn't play tennis, he was still homeschooled under their program.  And Evan wasn't doing his homework, and this had been going on for a period of time --

MR. DURASKI:  Your Honor, excuse me for interrupting.  If she's talking about a minor child, I think it would be inappropriate for her to use this child's name further in a public hearing.

MR. GANTER:  I'll direct the witness to just use the initial, Your Honor.

THE COURT:  I'm muted, but I'm now unmuted.  Yeah, the objection is sustained, and please refer to the -- any minors by their initials.

A.   Well, at the time, the child was not keeping up with the homework.  So he was talking to the child about doing the homework because he told him "Another student cannot keep helping you do your homework because he's getting behind," and C. S. was there as well, the child's sister.  And a friend of the grandmother's was there in the laundromat and heard the conversation and called the grandmother.  And the grandmother came up there and things just fired out of control after that.

Q. (Mr. Ganter, continuing:) Okay. Well, let me ask you: You said that these folks were at a -- who was at the laundromat?

A. The -- Coach Leroy and the team were at the laundromat. They were doing laundry, and at that time, they were on a break. So the kids were there doing homework. They were using the Wi-Fi there in the laundromat.

Q. Okay. And during this incident at the laundromat, the students are washing their clothes I presume?

A. Yes.

Q. Okay. And that they're doing their homework there as well?

A. Yes.

Q. Okay. And that there was an incident where Coach was talking to E. S.?

A. Yes.

Q. And E. S. is C. S.'s younger brother?

A. Right.

Q. Now, E. S. was not in the tennis program; correct?

A. No.

Q. But he was being homeschooled?

A. Yes.

Q. And he was -- and Coach Leroy -- or -- yeah, Coach Leroy was telling him "You have to" -- "You can't" -- "You have to keep up with your own schoolwork because other students are

getting behind"?

A. Yes. Because they were trying to help him get his work done, and so they were starting to get behind because they were trying to help him out.

Q. In doing that and while Coach Joyner was doing that, someone who knew E. S. came in?

A. That's right.

Q. To the laundromat?

A. Correct.

Q. And then what happened after that?

A. That -- that person that knew E. S. called his grandmother and told her what was going on, and the grandmother came up there.

Q. So the grandmother then came to the laundromat?

A. Yes.

Q. Was there a confrontation?

A. I wouldn't say a confrontation but --

Q. A discussion?

A. Yes.

Q. And who was in this discussion?

A. I believe it was Coach Leroy and the grandmother.

Q. What happened as a result of that?

A. Well, he was just basically trying to explain to her about E. S. not keeping up with the homework, he was two or three weeks behind, and how much it was going to -- you know, how

long it was going to take for him to get caught up with the homework. And that's basically what he was trying to get her to understand, you've got to stay on top of this work. We — we can't be getting behind.

Q. Okay. How was C. S. getting along with her parents?

A. Not well.

Q. Can you explain, when you say "not well," what you mean by "not well"?

A. There was several occasions she came to the tennis court. She was complaining about her mother not taking baths for two or three days at a time. She was complaining about her dad not taking baths two or three days at a time. She would complain about her mother being high, not feeding them, not getting laundry done, and the house being nasty. She was just unhappy with her homelife.

Q. Okay. Were there times when, if you know, Shelly would send text messages to Coach Joyner?

A. Yes.

Q. And do you know if one of those text messages included Coach Joyner disciplining her for things that were done at home — or things that C. S. did at her house that Coach Joyner should discipline her for?

A. (No response.)

Q. You don't recall that?

A. (No response.)

Q.   Would Coach Joyner discipline C. S. for things when his mother -- when her mother asked him to do it?

A.   No.

Q.   So if there was any discipline, it had to do with tennis?

A.   Correct.

Q.   And Shelly had already consented to that; correct?

A.   Correct.

Q.   You indicated that your -- now, this entire time for these years, your daughter was involved; is that correct?

A.   Yes, sir.

Q.   And although she'd might not be a minor then, she was -- now, she is a minor -- she was a minor then; is that correct?

A.   Yes, sir.

Q.   So I'm going to use her name as H. M.; is that correct?

A.   Correct.

Q.   Is that her initials?

A.   Yes.

Q.   Did H. M. ever share with you any information regarding anything inappropriate going on between Mr. Joyner and C. S.?

A.   No, sir.

Q.   Or Coach Joyner and C. S.?

A.   No, sir.

Q.   Now, as a result of this incident at the laundromat, that spiraled into the Sanders basically forbidding or demanding that C. S. not be a part of Grassroots; is that correct?

A.   Correct.

Q.   And at some point in time -- but C. S. was not happy with that; is that right?

A.   That's correct.

Q.   What did C. S. want to do?

A.   She wanted to continue playing tennis.

Q.   Did she express this to you or anyone else in Grassroots?

A.   Yes.

Q.   And then Shelly found out that C. S. was still contacting Grassroots; is that correct?

A.   Correct.

Q.   Now, this wasn't Coach Joyner contacting C. S.; is that correct?

A.   That's correct.

Q.   This was C. S. contacting y'all?

A.   That's right.

        MR. DURASKI:  Your Honor, I'm going to object (indiscernible) leading.

        THE COURT:  Sustained.  Please rephrase.

Q.   (Mr. Ganter, continuing:)  Who was contacting who?

A.   C. S. was contacting Grassroots.

Q.   As a result, what happened after C. S. continued to contact Grassroots?

A.   That's when Coach Leroy decided to pull the team out of Ozark because she was threatening if -- as long as we were in

Ozark practicing, she would walk to the tennis court; she would get there any way she could.  So Coach Leroy called a meeting and talked with me, and he decided "Hey, we can't do this.  We can't have any more confrontation.  We can't have any more, you know, going on with Casey.  We don't want to get in any more trouble.  So what I'm going to do is pull the team out of Ozark, and we're going to go to Columbus."  And that's what he did.

Q.  Okay.  So essentially the Sanders ran y'all -- or I'm not going to say "ran" -- but caused y'all to leave Ozark?

A.  Yes, sir.

Q.  Would you characterize that as harassment, what she was doing?

A.  Yes, sir.

MR. DURASKI:  Objection, Your Honor.  Harassment is a legal definition.  There's no basis laid that this defendant -- or this witness --

MR. GANTER:  I'll rephrase.

Q.  (Mr. Ganter, continuing:)  How did you -- how did constantly seeing her at the tennis court make you feel?

A.  Really I was angry about it.

Q.  And why is that?

A.  Because this was just the most horrendous thing I had ever heard in my life.  I mean I feel like it was a witch-hunt.  The grandmother was embarrassed because the friend heard

Coach Leroy having the conversation in the laundromat with E. S. about his homework, and they were embarrassed about it because they are supposed to be prominent-named people in Ozark. And I just feel like it -- they were embarrassed about it.

Q. Why would they be embarrassed? Do you know?

A. Yeah.

Q. Why?

A. Because he's a black man getting on to a white child, and that is a no-no in Ozark, Alabama.

Q. So this whole incident at the laundromat led to them getting really upset and essentially pulling C. S. out of Grassroots?

A. Yes.

Q. And I think you testified earlier that C. S. maintained contact with Grassroots?

A. Yes.

Q. What happened after that?

A. We ended up in court --

Q. Let me ask you: How did y'all wind up in court?

A. Her mother wanted a protection order for her against Coach Leroy.

Q. But I thought you said that Coach Joyner had already decided to pull out of Ozark?

A. That was -- that was after the --

Q.   After?

A.   -- court -- uh-huh -- the court hearing.

Q.   Okay.  And there was a protect- -- there was a hearing?

A.   Yes.

Q.   Was C. S. present at the hearing?

A.   Yes, sir.  The whole family, the whole Sanders family.

Q.   Did you have an opportunity to observe C. S. at the hearing?

A.   Yes, sir.

Q.   How did she appear to you?

A.   She was crying the whole entire time.  She kind of sat distant from her family.  Like, her parents were, like, on the bench, and she sat kind of away from them.

Q.   Do you know if she was still maintaining contact with Grassroots?

A.   Yes, sir.

Q.   She was?

A.   Yes, sir.

Q.   And who was she contacting?

A.   Spirit.

Q.   Do you know the substance of those contacts?

A.   From what I was told, she was always apologizing, saying "I'm sorry this happened.  I didn't mean for this to happen," and "I don't know why this has happened" and begging for forgiveness.  She didn't want the team mad at her.  This wasn't

her doing.

Q. So she was sort of caught in the middle?

A. Yes.

Q. And then on one side, she had her tennis family; right?

A. Right.

Q. And who was on the other side?

A. Her real family.

Q. And so there was an order that came down; correct?

A. Correct.

Q. And what did that order say?

A. I'm not aware of what was --

Q. Do you know?

A. No.

Q. Okay. Did you have any communication with C. S. after that?

A. No, sir. We were forbidden.

Q. And who forbade you from having any contact?

A. The judge.

Q. Did you ever hear whether or not C. S. was still communicating with Grassroots?

A. No. Because they never responded to her texts because Leroy said if she tried to contact any of us, don't respond. We didn't need any more trouble. So after, I guess, maybe about a month maybe of her sending the text messages, no response, I think she finally stopped because I didn't hear

Coach Leroy or Spirit say anything else about getting text messages.

Q. So after the judge had entered the order, C. S. was still responding for at least a month?

A. Yes, sir, I believe so.

Q. And that would have been sometime in late 2018, early 2019?

A. Yes, sir, I believe so.

Q. And it was -- let me make sure I've got this right and the Court has it right -- that it was Coach Joyner who basically said, "Don't respond to her"?

A. Yes, sir.

Q. Okay. Let me ask you this: I've explained to you the nature of the charges; correct?

A. Correct.

Q. And you were with these folks and -- for -- nonstop for about how long? How many years? Six, seven years?

A. Yes, sir. Still involved.

Q. Still involved?

A. Yes, sir.

Q. Have you seen anything that you would consider improper conduct by Coach Joyner?

A. No, sir.

Q. Involving any teammate?

A. No, sir.

Q.  Or student?

A.  No, sir.

Q.  And specifically you don't -- you saw nothing that you would consider improper or -- improper or sexual in nature or anything like that between Coach Joyner and C. S.; is that --

A.  No, sir.

Q.  -- correct?

A.  That's correct.

Q.  And if I -- I just want to make sure.  It was Coach Joyner that maintained -- that directed y'all not to have contact with C. S.; correct?

A.  Correct.

Q.  And then after that, we had these charges; is that correct?  At some point in time afterwards, these charges came up -- well, let me ask you this:  Did you know when these allegations by C. S. were made?

A.  Which one?

Q.  This -- the one that's the reason why we're here today.

A.  No, sir.  I -- this is my first hearing about this.

Q.  So never heard anything about it?

A.  Not since that first hearing.

Q.  Nobody from the FBI has come and talked to you?

A.  No, sir.

Q.  Anybody from the U.S. Attorney's Office?

A.  No, sir.

MR. GANTER: Your Honor, at this time, I will pass the witness.

THE COURT: Thank you.

Mr. Duraski, cross?

MR. DURASKI: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DURASKI:

Q. Ms. McLendon, my name is Russell Duraski. I'm an assistant United States attorney. Can you hear me okay?

A. Yes, sir.

Q. Okay. Let me just follow up on a few questions that Mr. Ganter asked you.

You said that you were the team mom for this Grassroots Tennis Association and that you began in that capacity in 2013; is that correct?

A. Yes, sir.

Q. Okay. During the time that you were the team mom, the person C. S. was already on the team and remained on the team through all this business in 2018; is that right?

A. Yes, sir.

Q. And how old was C. S. during that time frame?

A. I'm not sure.

Q. Is it fair to say that she was a teenager?

A. When we first started, I believe, in 2013, no, sir. Because my daughter was not a teenager.

Q.   All right.  Did she become a teenager during that time frame?

A.   Yes, sir.

Q.   Okay.  And you said you were very close to the students, but you don't know how old she was?

A.   No, sir.  Maybe like a year or two -- I didn't keep up with their ages.  I -- I just knew my daughter was the oldest on the team, and their age ranges like two years apart of each other.

Q.   All right.  How old was your daughter in 2018?

A.   17, I believe.

Q.   Okay.  So if C. S. is a year or two younger than your daughter, in 2018 she'd have been 15 or 16?

A.   Yes, sir.

Q.   Okay.  Now, you were very involved with the team; is that correct?

A.   Yes, sir.

Q.   And you were very supportive of your daughter and you were present a lot, so you knew what was going on with your daughter all the time with that team; is that right?

A.   Yes, sir, pretty much.

Q.   C. S. didn't have the same maternal support with the team that your daughter had, did she?

A.   No, sir.

Q.   Her mother was not involved; is that right?

A.    Correct.

Q.    So C. S. is involved with the team, and you described that as her tennis family.  Having a bad family life at home, is it fair to say that the tennis family became a substitute family for C. S.?

A.    Yes, sir.

Q.    Okay.  And eventually you said that C. S. actually went and lived with Coach Joyner; is that right?

A.    No, sir.

Q.    All right.  Well, you said a lot of the students lived with him, but C. S. wasn't one of those students?

A.    No, sir.

MR. GANTER:  Your Honor, I'm going to object.  That's a mischaracterization of the testimony.  There were only three students who were indicated that would -- that lived there, and the witness identified those by initials.

MR. DURASKI:  And that's why I'm asking to clarify, Judge.  I thought she said that.  I mean, if I'm wrong, I'm wrong.  (Indiscernible).

THE COURT:  I'll allow the witness to clarify that.

Q.    (Mr. Duraski, continuing:)  All right.  My question is simply this:  Did C. S. live with him or not?

A.    No, sir.

Q.    Okay.  Well, let's talk about where Coach Joyner did live since you were so close to the team.

You said that he had a residence in Ariton during this time frame; is that right?

A. Yes, sir.

Q. All right. Are you aware that he also had a residence in Columbus, Georgia?

A. Yes, sir.

Q. Okay. And if there was an occasion that C. S. was at that residence in Columbus, Georgia, you may not have known about that, had you?

A. Yes, sir.

Q. You would have known everywhere that C. S. was all the time?

A. Oh. Not all the time, no, sir.

Q. And so there could have been times that C. S. was somewhere with Coach Joyner and you were unaware of that, weren't you? You didn't --

A. (Indiscernible.)

Q. -- know where C. S. was 24 hours a day, did you?

A. No, sir, I didn't.

Q. Okay. And you didn't know where Coach Joyner was 24 hours a day, did you?

A. No, sir.

Q. So if Coach Joyner took someone with him to his home in Columbus, Georgia, you may not have known about that. Isn't that a fair statement?

A.   No, sir, that's not a fair statement.

Q.   You think you knew every person that ever went to Coach Joyner's home in Columbus, Georgia?

A.   Yes, sir.

Q.   Okay.  Name them for that time period.  Name every person that ever went to Coach Joyner's home during that time period.

MR. GANTER:  Your Honor, naming everybody who went to Coach Joyner's residence is outside the scope of what we've been talking about here today.  Her testimony --

THE COURT:  Overruled.  This is cross-examination.  The witness has stated that she was aware of everyone that visited the home.  The Government is entitled to follow up.

Q.   (Mr. Duraski, continuing:)  All right.  Ms. McLendon, start naming everybody that went to Coach Joyner's home in Columbus, Georgia, from 2013 to 2018.

A.   Well, they didn't have a residence there in 2013.

Q.   No.  I'm -- you said you knew every person that ever went there.  That's what you told me.  And I want you to name every person that ever went to his home, whether they're associated with the tennis team or not.  You said you know everybody that went there.

A.   Okay.  Do I use initials or use names -- well, first of all, they didn't have the residence in Columbus, Georgia, in 2013.

Q.   Okay.  When did they get the residence in Columbus,

Georgia?

A.   Maybe 2016.

Q.   Okay.  Do you still maintain that you can name every person that went to that residence with Coach Joyner from 2016 to 2018?  And I'm not talking about just tennis students.  You said you know everybody who went there.

A.   Yeah, because they only deal with tennis people.

Q.   So if he had a friend who lived in Columbus, Georgia, who came over to his house one night for supper, you would know about that?

A.   Yes, sir.  Because they don't have friends like that.

Q.   You're telling me Coach Joyner doesn't have any friends who live in Columbus, Georgia, and you know that?

A.   Yes, sir.

Q.   You're telling me he doesn't have friends anywhere else that go and visit him except people that you know?

A.   Yes, sir.

Q.   Really?

MR. GANTER:  Asked and answered, Your Honor.

THE COURT:  Sustained.

Q.   (Mr. Duraski, continuing:)  All right.  Well, start naming them.  The Judge said you had to answer the question, so name every person who ever went to Coach Joyner's house from 2016 to 2018.

A.   Myself, my daughter, S. S., D. S., M. S., his first name

is J. I don't remember his last name. He taught his son tennis lessons and his daughter down in Ozark. He would visit. There was another gentleman that Coach Leroy was teaching tennis lessons to. He visited first time to time with his daughter to get lessons there in Columbus with Spirit and the other two girls; C. S.; D. M., K. H., and his other two daughters were there.

Q.   Okay. Name every player who played for him on the Enterprise tennis team and tell me whether or not that person went to the house in Columbus, Georgia.

A.   No, they did not.

Q.   How do you know?

A.   Because once we stopped with the team tennis, he no longer dealt with the children in Enterprise.

Q.   But before you were a part of the team tennis, did any of those children from Enterprise or any family member from Enterprise go to his house in Columbus, Georgia?

A.   No.

Q.   You're sure of that?

          MR. GANTER:  Asked and answered, Your Honor.

          MR. DURASKI:  Your Honor, I'm --

          THE COURT:  Sustained.

          MR. DURASKI:  I'm examining this witness's recollection and her creditability.

          THE COURT:  I understand, Mr. Duraski. The objection

is sustained.

Q.   (Mr. Duraski, continuing:)  All right.  Let me ask you this -- let's move on.  All right.  You said he had a house in Ariton, he had a house in Columbus.  Are you aware that he was staying in a residence in Altamonte Springs, Florida?

A.   Is that part of Orlando, Florida?

Q.   Altamonte Springs, Florida, is the address.  I'm asking you if you know about an address in Altamonte Springs, Florida.

A.   No.

Q.   You do not?

A.   No.

Q.   All right.  So if he had people at that address, you wouldn't know about it because you didn't know about the address, did you?

MR. GANTER:  Objection, Your Honor.  That is not a question.  That is a narrative from the prosecutor.

MR. DURASKI:  This is --

THE COURT:  Sustained.

MR. DURASKI:  This is cross-examination, Your Honor. I'm --

Q.   (Mr. Duraski, continuing:)  Would you have known about the address in Altamonte Springs?

A.   No.

Q.   All right.  It's my understanding that his children -- Coach Joyner's children -- reside in Orlando, Florida; is that

correct?

A.   Yes.

Q.   Are you aware that his mother lives in St. Helena Island, South Carolina?

A.   Yes.

Q.   And his father lives in Miami, Florida?

A.   Yes.

Q.   He's got a sibling that lives in Greenville, South Carolina?

A.   Yes.

Q.   And another sibling that lives in Charlotte, North Carolina?

A.   I'm not sure about Charlotte.

Q.   Okay.  Now, you said earlier that you were very involved with the team but that C. S.'s mother was not; is that correct?

A.   Correct.

Q.   Okay.  Were there ever occasions that there were tennis tournaments out of the state that you and your daughter did not attend?

A.   I think there was only one.  And that was at the time my mother passed away.

Q.   Okay.  And when was that?

A.   April 2018.

Q.   Okay.  And C. S. was a part of the team at that time; is that right?

A.   Yes.

Q.   Okay.  You also talked about Coach Joyner having a van.  Was it a white van?

A.   Yes.

Q.   Do you know what kind of van it was?

A.   It seated eight people.

Q.   I know.  But do you know what kind of van it was?  Like, Ford, Chevy -- do you know?  If you don't know, it's okay.  I'm just wondering if you know.

A.   I think it was a Ford.

Q.   Okay.  When's the last time you saw that van?

A.   I'm not sure.

Q.   Okay.  You talked a little bit about some corporal punishment that took place.  There was -- the students were paddled with a board; is that right?

A.   Yes, sir.

Q.   Okay.  Did you ever see the board?

A.   Yes, sir.

Q.   All right.  Did the students ever complain to you about being paddled?

A.   No, sir.

Q.   Okay.  No student ever complained about that?  They complained about the food and the temperature but not being paddled?

A.   No, sir.

Q.   Okay.  You were involved in this, and there was some tournaments out of the state that were sponsored by a national organization; is that right?

A.   Yes, sir.

Q.   I think you said you don't know the name of the national organization?

A.   I just don't remember it.

Q.   Okay.  You said that C. S. made certain inappropriate comments.  Do you remember testifying about that?

A.   Yes, sir.

Q.   And that you disciplined her or corrected her about saying that; is that right?

A.   (No response.)

Q.   Is that right?

A.   Yes, sir.

Q.   Okay.  Did C. S. seem to have an attraction to Coach Joyner?

A.   I wouldn't say it was an attraction, more or less infatuated.

Q.   Okay.  And during this time frame, when she's a young teenager, based on the way you described it, is it fair to say her mother and father were fairly absent from her upbringing?

A.   Now, I don't know about her upbringing.

Q.   Well, in terms of the involvement with this tennis, her schooling -- that sort of thing, they were fairly absent.  Is

Q.   that fair to say?  I'm just understanding what you were saying.

A.   Pretty much.

Q.   Okay.  Did your daughter ever travel out of state with Coach Joyner without you being present?

A.   Yes, sir.

Q.   Did C. S. ever travel out of state without her mother being present?

A.   Yes, sir.

Q.   You talked to Mr. Ganter about the Dale County action that involved the restraining order that was issued back in 2018.  Do you remember that?

A.   Yes, sir.

Q.   Okay.  And the Court did, in fact, issue an order in favor of Shelly Sanders and her family regarding Coach Joyner in terms of staying away from C. S. and her family; is that right?

A.   Yes, sir.

MR. DURASKI:  Judge, that's all the questions I have for this witness.

THE COURT:  All right.

Mr. Ganter, any redirect?

REDIRECT EXAMINATION

BY MR. GANTER:

Q.   I just want to clarify.  When you indicated that individuals are at -- were at the Charleston -- I mean, the Columbus residence -- that residence was -- 2016 when they got

the residence; is that correct?

A.   I think so.

Q.   Is that the best of your recollection?

A.   Yes, sir.

Q.   And you named off a host of individuals that you knew were at the Columbus residence; is that correct?

A.   Yes, sir.

Q.   And they were all connected with Grassroots; is that correct?

A.   Yes, sir.

Q.   And you say -- you said that the only out of state trip that you missed was when your mother was suffering from --

A.   Cancer.

Q.   -- (indiscernible) cancer --

A.   Yes.

Q.   -- would have been April of 2018; is that correct?

A.   Well, it was from January 2018 up until April 2018.

Q.   Okay.  And that would have been it; correct?

A.   Yes.

Q.   So any trips to Louisiana or anything like that, you would have been on; is that correct?

A.   What was the time frame?

Q.   Do you remember going to Baton Rouge?

A.   Not Baton Rouge.

Q.   Did you go —

A.   We went to Shreveport.

Q.   Shreveport?

A.   Yes.

Q.   And you do remember that trip; is that correct?

A.   Yes, sir.

Q.   All right.  Do you remember when that was?  Could you give a year?

A.   I want to say it was after -- my mother passed away in April.  It was in 2018.

Q.   Okay.

A.   Maybe May or June.  I'm not sure.

Q.   Okay.  But it was 2018?

A.   Yes, sir, I believe so.

          MR. GANTER:  Nothing further, Your Honor.  Thank you.

          THE COURT:  Mr. Duraski, any recross?

          MR. DURASKI:  Just a real quick follow-up.

                    RECROSS-EXAMINATION

BY MR. DURASKI:

Q.   Ma'am, Mr. Ganter just asked you about the folks that went to the Columbus house.  He just asked you that again just a minute ago.  If there were folks at that Columbus house that you know went there, you weren't there yourself every time somebody else went there, were you?

A.   No, sir.

          MR. DURASKI:  That's all, Judge.

THE COURT:  Ms. McLendon, you may step down.

Mr. Ganter, you may call your next witness.

MR. GANTER:  Your Honor, I don't have any more witnesses to call.

THE COURT:  All right.  Would you like to take a recess before we start with the Government's case?

MR. GANTER:  I'm ready to proceed, Your Honor.  It's up to the Government.

THE COURT:  Yeah.

MR. DURASKI:  Judge, I'm ready to go ahead if it pleases the Court.  If we need a break --

THE COURT:  Yes.  No.  Why don't we move on then.  I just wanted to give -- we've been going quite a while so...

Mr. Duraski, you may call your first witness.

MR. DURASKI:  Thank you, Judge.  I'll be frank with you, Your Honor.  I think Ms. Baxter may have told you, I've injured my back, so I kind of need to keep moving as I can.

THE COURT:  That's fine, and that's -- and if we want to take a five-minute recess, just let me know.

MR. DURASKI:  Your Honor, I think it would be better for me to keep going.  I've kind of gotten myself in a position where I can sit right now, and I hope to finish this and then be able to take the pain medicine.

THE COURT:  Okay.  Then --

MR. DURASKI:  (Indiscernible) --

THE COURT:  And, Mr. Ganter, I see your client is waving his hand.  Do you need to speak with him?

MR. GANTER:  I'm not quite sure what -- I guess we need to talk.

THE COURT:  All right.  Is there a cell phone that you can speak to him directly?

MR. GANTER:  We've asked the jail to make sure that there is a cell phone and that he have access to it.  I think he needs to knock on the door there to get it.

THE COURT:  Then I'm going to allow Mr. Ganter to speak with his client, and -- but we're going to proceed with (indiscernible).

(A recess was taken at 11:24 a.m.)

THE COURT:  All right.  I see that Mr. Ganter is present; Mr. Duraski is present.  Can everyone see and hear me?

MR. DURASKI:  Yes, Your Honor.

THE COURT:  And if we're ready to proceed, Mr. Duraski, you may call your first witness.

MR. DURASKI:  Your Honor, we would call FBI Agent Heather Holt.

THE WITNESS:  Can you hear me?

MR. DURASKI:  Yes.

I need the witness to be sworn, Your Honor.

THE COURT:  Yes.

Good morning, Special Agent.

THE WITNESS: Good morning.

HEATHER HOLT WHELAN,

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

THE COURT: And, Special Agent, I want to give you the same instruction that I gave to the defense witnesses that even though we're here on VTC, this is a court proceeding, and the oath applies just as if we were present in the federal courthouse today.

THE WITNESS: I understand, Your Honor.

DIRECT EXAMINATION

BY MR. DURASKI:

Q. Good morning, Special Agent Holt. Would you state your full name and spell your first and last name for the record, please.

A. It's Heather Star, last name W-h-e-l-a-n Holt, H-o-l-t.

Q. And, Agent Holt, how are you employed?

A. With the FBI.

Q. In what capacity?

A. As a Special Agent.

Q. How long have you been employed with the FBI?

A. Eleven years.

Q. And during the course of your employment with the FBI, have you had an occasion to investigate allegations involving

Leroy Thomas Joyner, Jr.?

A.    I have.

Q.    Okay.  And are you the -- what would be called the case agent on that case?

A.    I am.

Q.    All right.  And now I'm going to ask you to look at your screen the way this is working.  Do you see Mr. Joyner?

A.    I do.

Q.    Can you just point out or describe what he's wearing for the record?

A.    He's wearing an orange jumpsuit.

Q.    Okay.

        MR. DURASKI:  Your Honor, it's kind of an odd situation, but I'd ask the record to reflect that Agent Whelan-Holt has identified Mr. Joyner for the record.

        THE COURT:  And the record so reflects.

Q.    Mr. Duraski, continuing:)  Okay.  Special Agent Whelan-Holt, can you tell the Court how you got involved in the investigation involving Mr. Joyner?

A.    Yes.  In January of 2019, Inv- -- Deputy Sheriff Tyler Harrington approached me from Dale County Sheriff's Department regarding sexual allegations against Mr. Joyner.

Q.    Okay.  And when you received that information from the sheriff's department, what did you do next?

A.    We set up an interview with the child advocacy center.

Q.   Okay.  And did you, in fact, interview a child?

A.   The child advocate did at the child advocacy center.

Q.   Okay.  And were you able to see or hear the interview or review the interview?

A.   Yes, I was.

Q.   Okay.  And we've been referring today to an individual by the initials of C. S.  Is the child that was interviewed at the child advocacy center the same C. S. that we were referring to earlier today?

A.   Yes, she was.

Q.   Okay.  And how old was the child at the time of that interview if you recall?

A.   15, I believe.

Q.   Okay.  And what time frame are we talking about that she alleges that she was the victim of sexual abuse at the hands of Mr. Joyner?

A.   From approximately the ages of 14 to 15.

Q.   Okay.  And do you know how old Mr. Joyner is?

A.   I believe in his late 40s.

Q.   Okay.  Would he have been more than two years or -- or at least four years older than her at the time this alleged abuse occurred?

A.   Yes, he was.

Q.   Okay.  And where is the abuse alleged to have occurred?

A.   In Alabama and Columbus, Georgia; and --

MR. GANTER:  Your Honor, I'm going to object.  I don't know the foundation of the agent's testimony.  If the Government could lay it out for me, please.

THE COURT:  Sustained.

Q.  (Mr. Duraski, continuing:)  All right.  Well, let's go back to the interview.

What did C. S. claim happened to her?

A.  C. S. claims that her first --

MR. GANTER:  Your Honor, I'm going to object.  That's not an adequate foundation.  I don't know how the agent knows this information.

MR. DURASKI:  Your Honor, we just testified that she was privy to an interview that took place at the child advocacy center and that she was aware of that interview, and we're talking about what happened in the interview.

THE COURT:  The objection is overruled.  You may continue.

A.  C. S. told the advocate -- the counselor that the first time she had a sexual experience with Mr. Joyner was at his house in Ariton, and then --

Q.  Okay.  Go ahead.

A.  And then for approximately, I think she said, about a week later, there was another incident in the white van at the tennis courts in Ozark.

Q.  All right.  And she described an ongoing sexual

relationship with Coach Joyner?

A.   She did.  She -- she couldn't -- she advised that they had sexual encounters approximately 20 times overall.

Q.   Okay.  And did you actually participate eventually in interviewing C. S. yourself?

A.   I did.

Q.   Okay.  And the knowledge that you have about her, would it be from the CAC interview and your own interviews with her?

A.   It is.

Q.   Okay.  Would you tell the Court what C. S. has described to you as happening to her over the course of this relationship just to give the Court, first of all, an overview about the relationship between C. S. and Coach Joyner?

A.   I mean as stated, I mean, like I said, she -- she grew up from, like, a young age with, you know, going to Joyner's tennis and staying at their house some in Columbus.  And she did describe it as, like, a family-like environment.  And she had known him since she was approximately I think 9 years old and, you know, trusted him, you know, kind of like that -- that figure, you know, for her, but that started changing when she was late 13, almost 14, into a more sexual relationship.  And he showed her a lot of attention, and she liked the attention.

Q.   What would -- did C. S. describe what her family life -- her actual family life was like?

A.   She did acknowledge to us that, yeah, it was a troubled

family life.  I think she said her dad was on some type of disability.  Her mom had some problems -- "issues" is what she had stated, and that's why she was staying with the Joyners.

Q.    Okay.  Did she actually stay with Coach Joyner at some point?

A.    She said she did.  I can't remember exactly what summer, but, like, it was like a two-, three-week period she did stay with him over one of the summers.

Q.    And where was it that she was staying with him?

A.    In Columbus, Georgia.

Q.    Okay.  Did she say to you whether or not there were sexual acts performed in Columbus, Georgia?

A.    She did.

Q.    And not to ask you to be too graphic, but I need you to tell me what kind of sexual acts she alleges took place in Columbus, Georgia.

A.    Both vaginal sex and oral sex.

Q.    Okay.  Did she say the oral sex was her performing it on Coach Joyner or vice versa or both?

A.    Both, I believe.

Q.    Okay.  And obviously Columbus, Georgia, is outside the State of Alabama; is that --

A.    Yes, it is.  Yes.

Q.    All right.  Now, you said a minute ago that you -- in your testimony that she alleged maybe 20 sexual encounters over this

period of time. Again, what time frame are we talking about?

A. The sexual encounters were 2017 to 2018. Approximately, 2017 to 2018.

Q. And this would have been when she was an early teen?

A. Correct.

Q. All right.

A. 14, 15.

Q. Now, there's been some testimony that I know you've heard about the Grassroots Tennis Association. Have you done some investigation into the Grassroots Tennis Association to try to corroborate anything that C. S. told you?

A. Yeah. I mean they do have a website. All their phone numbers are listed. Spirit's phone number is listed. And it shows some of their sponsors on the website, and it shows they're associated with a national tennis association. So, yes.

Q. Okay. So did you, in fact, contact the national tennis association to determine if the Grassroots Association participated in tournaments outside of the state of Alabama?

A. I did. And they did verify that information.

Q. Okay. Did you find that there were tennis tournaments outside of the state of Alabama that C. S. would have attended that were sponsored by the national tennis association?

A. Yes.

Q. Okay. Was there -- can you tell me -- just give me an

example of someplace those tennis tournaments may have been.

A.   Baton Rouge, Metro Atlanta ones -- I can't remember specifically, but I know there was some in Metro Atlanta -- of course, South Carolina.  Those are the ones I can think of offhand -- Mobile.  Of course, that's in Alabama but...

Q.   Okay.  So were there rosters or schedules that showed what Grassroots Tennis Association player participated in an out-of-state tournament?

A.   It does.

Q.   Okay.  Did those rosters show you in the course of your investigation whether or not C. S. was taken out of state?

A.   It did.

Q.   Okay.  Was there ever an occasion where you saw that she was the only tennis player entered in a tournament?

A.   I can't recall.

Q.   Okay.  Did C. S. tell you how they traveled out of state?

A.   She said it was primarily by the white van, but there was -- on a couple of occasions, they took the white Mustang that was Spirit's I believe.

Q.   Okay.  Who would have ridden in the Mustang?

A.   If I'm recalling right, she said herself, Spirit, and Mr. Joyner.

Q.   Okay.  So -- and I want to make sure I'm clear on that. She said there was at least one occasion where just the three of them were together in a car?

A.   She did.

Q.   Okay.  Going to a tennis tournament somewhere?

A.   Correct.

Q.   All right.  Did C. S. ever allege any -- and I think you touched upon it a minute ago -- but any activity that took place in the white van?

A.   She -- she did.  She -- from what she can recall, at least four sexual events happened inside the van.

Q.   Have you been able through the course of your investigation to determine whether or not such white van actually exists?

A.   Yes.

Q.   Have you -- tell the Court what you know about the white van.

A.   We had some agents in Columbia, South Carolina, drive by the residence in Columbus, Georgia, and he took pictures of the white van with a tennis visor off the rearview mirror.

Q.   Have you had an occasion to show C. S. those pictures of the van and ask her whether or not that was the van that she was talking about the sexual (indiscernible) took place in?

A.   I did.  And she did corroborate that was the van.

Q.   Okay.  Has any other student complained to you about sexual activity between them and Coach Joyner?

A.   Not between them and Coach Joyner, no.

Q.   Well, what did they describe?

A.   They described an event where they and C. S. had --

MR. GANTER:  Objection, Your Honor.  I'm going to ask that the Government lay the proper foundation.

THE COURT:  I'm going to overrule that objection.  I understand the question, and I -- the proper foundation has been laid.

Q.   (Mr. Duraski, continuing:)  Okay.  Special Agent Holt -- Whelan-Holt, can you go ahead and tell what the other student told you.

A.   So the other student said that there was a sexual encounter between himself and C. S. and it was directed by Mr. Joyner and it took place in the van.

Q.   (Indiscernible)  Coach Joyner --

A.   (Indiscernible.)

Q.   I'm sorry.  Go ahead.

A.   The -- the concept behind it was if they performed this sexual act together, then they would not be punished corporally.

Q.   So --

A.   They wouldn't be paddled.

Q.   They wouldn't be paddled if they perform sex with each other in front of Mr. Joyner?

A.   Correct.

Q.   Okay.  Are you familiar with the civil action that was brought by C. S.'s family against Coach Joyner down in

Dale County?

A.   I am.

Q.   Okay.  Was that action brought to obtain some sort of restraining order against Coach Joyner?

A.   Yes.

Q.   Did the Court issue an order in favor of C. S.'s family against Coach Joyner in that action?

A.   Yes.

Q.   You mentioned the paddling.  I'd like for you to tell the Court what you were told by C. S. -- first of all, C. S. regarding the paddling.  How was that handled?

MR. GANTER:  If I may have a second, my client is notifying me.

MR. DURASKI:  Judge, I'm -- he can talk to him when I'm through cross-examining.  I don't think we have to take a break in the middle of my cross-examination for that conference.  We wouldn't in a regular courtroom.

THE COURT:  I agree with the Government.  You may proceed with your --

MR. GANTER:  Your Honor, this is the problem with being at a video hearing.  If I had access to my client, he would be able to tell me -- right next to me, he would be able to converse with me.  That's what this is.  That's a substitute for that type of hearing.

THE COURT:  And Mr. Ganter has changed my mind.  I

agree with you, Mr. Ganter, that your client would be able to whisper if he were present in the courtroom.

Because of these circumstances, I'm going to allow it, Mr. Duraski.

MR. DURASKI: And Your Honor, in fairness to Mr. Ganter, as I think about that, his client could have handed him a note in the courtroom. So I agree. I'll pause. I have no problem with that.

THE COURT: So we'll take a brief recess.

(A recess was taken at 11:46 a.m.)

THE COURT: Mr. Ganter, can you see and hear me?

MR. GANTER: I can, Your Honor. We're ready to proceed.

THE COURT: All right.

Mr. Duraski, can you see and hear me?

MR. DURASKI: Yes, sir, Your Honor, I can.

THE COURT: And, Mr. Joyner, can you see and hear me?

COURTROOM DEPUTY: He's on mute.

THE COURT: Special Agent, can you see and hear me?

THE WITNESS: I can, sir.

THE COURT: All right.

And, Mr. Duraski, you may proceed.

MR. DURASKI: Okay.

Q.   (Mr. Duraski, continuing:) Special Agent Whelan-Holt, we were talking about the paddling. And I'd like to go back to

that for just a minute.

During the course of his direct examination of Ms. McLendon, Mr. Ganter asked his witness about the paddle. Do you remember that?

A.   I do.

Q.   Okay.  Did C. S. describe for you the paddle?

A.   She described two paddles.

Q.   Okay.  Tell me what she -- tell the Court what she described.

A.   One paddle is kind of like a 2-by-4, and it -- it did -- she said it had nails in it but the nails weren't sticking out. She -- you could just see the head of the -- the nail in the board, but there was no sharp parts sticking out so to speak. And then I think the other description was just like your normal-type paddle.

Q.   Okay.  Did C. S. tell you whether or not she was ever paddled?

A.   Yes.  She said they are referred to as chops.

Q.   Okay.  So getting struck with a paddle is chops?  Is that what you're saying?

A.   Yeah.  When they would get -- she described it as if they didn't do what they were supposed to do on the tennis court, they would get ten chops for not doing what they were supposed to be doing.

Q.   Okay.  Did she get chopped, as she put it, with both of

these paddles that she described?

A.   She said she did, yes.

Q.   Okay.  Was there ever an occasion where she told you that there was an alternative to getting chops?  That she could do something else to avoid getting chops?

A.   Yes.

Q.   What would she do?

A.   Well, the -- the one time, of course, was with the other individual that if they performed oral sex on each other, then they could avoid getting chops.

Q.   Did she ever say whether or not she engaged in sex with Mr. Joyner to avoid chops?

A.   I can't recall.

Q.   Okay.  Did C. S. talk to you about why she (indiscernible) to having sex with Mr. Joyner?  Was she -- did she feel threatened?  Did she -- what did she say?

A.   She -- she said she liked the attention.

Q.   Okay.

A.   Liked the attention.

Q.   Okay.

A.   Made her feel -- she said it made her feel special.

Q.   Okay.  And how old was she?

A.   She said the first time she was almost -- she said she could have been 14 or about to turn 14.

Q.   Okay.  Had she already been receiving chops before she

engaged in the sexual activity?

A. I -- if I recall, she was -- she was receiving chops. She started getting chops at approximately 13 years old.

Q. Okay. And then the sexual activity started after that?

A. Yes.

Q. Okay. Did the chops slow down once the sex started?

A. I don't believe so.

Q. Okay. Did you in the course of your investigation talk to other students who told you about the paddle?

A. Yes.

Q. Did they describe two paddles or one?

A. D. S. described one paddle that was like a 2-by-4.

Q. Okay. Did it have nails or not?

A. I don't recall.

Q. Okay. Did any other student describe any paddles?

A. Yes.

Q. What did they describe?

A. Just that it was like a piece of wood.

Q. Okay. There was some questions by Mr. Ganter to Ms. McLendon about the parents consenting to the paddling, the corporal punishment. Do you know anything about that?

A. If I -- if I recall correctly, I do remember C. S saying that her mother was aware of it, yes.

Q. Okay. Was there ever any indication that C. S.'s parents consented to sexual activity between C. S. and Coach Joyner?

A.    No.

MR. DURASKI:  Your Honor, I'm about to wrap up.  Just looking back over my notes real quick.

THE COURT:  That's fine, Mr. Duraski.

Q.    (Mr. Duraski, continuing:)  Special Agent Whelan-Holt, do you know where Mr. Joyner was when he was arrested on this case?

A.    Well, I mean, he was in Florida, Altamonte, Florida, but he --

Q.    Okay.

A.    -- he came up to Montgomery to be arrested.

Q.    Okay.  So he turned himself in?

A.    He did.

Q.    Okay.  But he has a residence in Florida?

A.    From what I understand is he was at an Extended Stay in Altamonte, Florida.  That's all I know.  I'm not aware of any permanent residence in Florida.

Q.    Okay.  Let me just go over this with you.  Are you aware that his mother lives in South Carolina?

A.    I am.

Q.    His father lives in Miami, Florida; is that right?

A.    Yes.

Q.    And the siblings in both Greenville, South Carolina, and Charlotte, North Carolina; is that correct?

A.    Yes.

MR. DURASKI: Judge, I believe that's all the questions I have for Agent Holt at this time.

Mr. Ganter may have some questions for you, Ms. -- Agent Holt.

THE COURT: And, Mr. Ganter, you may proceed with your cross.

MR. GANTER: Thank you.

CROSS-EXAMINATION

BY MR. GANTER:

Q. Agent Holt, I didn't catch this initially, but I want to back up to when you first got involved in the case. When was --

A. This would have been January of 2019, late January of 2019.

Q. And you said you were contacted by Deputy Harrington from Dale County?

A. Correct. Tyler Harrington.

Q. Now, do you know who contacted Deputy Harrington?

A. Yes. Shelly Sanders.

Q. Okay. And Shelly Sanders, who is C. S.'s mother, made a complaint against Mr. Joyner, Coach Joyner, initially on January the 17th of 2019; is that correct?

A. Correct.

Q. And that involved exclusively this paddling; is that correct?

A.   That's my understanding, yes.

Q.   Then a couple days later, January the 21st of 2019 —

A.   Correct.

Q.   -- Ms. Sanders again contacted Deputy Harrington from Dale County; is that right?

A.   Correct.

Q.   And this paddling allegation morphed into these sexual allegations; is that correct?

A.   Yes.  According to the police report, correct.

Q.   So it changed; right?

A.   Yeah.  According to the police report, that's what I have, yes.

Q.   Okay.  Now, after that you were contacted by Deputy Harrington?

A.   Yes.

Q.   Okay.  Now, there was an interview that was set up with child advocacy; is that correct?

A.   Correct.

Q.   And these child advocacy representatives, they work with DHR; correct?

A.   Correct.

Q.   And whenever -- it's standard procedure whenever that you have an individual -- an alleged victim, child victim that these folks will come in and conduct forensic interviews; is that right?

A.   That's right.

Q.   And that's because they're specially trained to do that; right?

A.   Correct.

Q.   Okay.  So was -- I -- in January, I think, the 23rd or something an interview that occurred between a child advocate and C. S.; is that right?

A.   Correct.

Q.   And Shelly Sanders was present for that interview, was she not?

A.   She was -- she was not in the room with her, but yeah, she was present.

Q.   Well, the interview took place at a DHR facility; right?

A.   It took place at -- well --

Q.   Down in Dothan?

A.   No.  It took -- took place at the CAC, yes.

Q.   Okay.  Down in Dothan; right?

A.   Yes, in Dothan.

Q.   Yes.  And Shelly Sanders drove C. S. (indiscernible); right?

A.   Correct.

Q.   Okay.  And so at a minimum, C. S. knew that Shelly was there; correct?

A.   Correct.

Q.   And there was an interview that took place inside that

room; is that right?

A.   Yeah.  The interview room, correct.

Q.   Were you privy to that interview?

A.   Correct, yes.

Q.   So you were on the outside looking in?

A.   Yes.

Q.   Okay.  So you were present as well?

A.   I was present -- there was one interview that it was just Investigator Harrington at the CAC, and then I was brought in for a second interview where I observed in at the CAC.

Q.   All right.  Well, now I'm confused.  So there were two interviews that took place on January the 23rd?

A.   No.  No.  No, there was only one on the January 23, yes.  Uh-huh.

Q.   Okay.

A.   Yep.  You're --

Q.   Who was --

A.   You're right.

Q.   Who was present for the January 23, 2019, interview?

A.   Well, Shelly Sanders was.  Investigator Harrington was -- I'm trying to think.  Hold on.

That was the first one, so I wasn't there for the first one.

Q.   Okay.  Do you know if that interview was recorded?

A.   Yes, it was.

Q. Was there an audio and a video recording of that interview?

A. Yes.

Q. Have you viewed and/or listened to that recording?

A. Yes.

Q. Have you provided a copy of that recording to Mr. Duraski, the U.S. -- AUSA assigned to this case?

A. Yes.

MR. GANTER: Your Honor, for the record, I'll just state this: I have not received a copy of that recording.

MR. DURASKI: Your Honor, if I may address that. I've returned to the office today and know that discovery had been provided. That recording we intend to ask for a protective order in regard to that I was going to discuss with Mr. Ganter. So we -- if it has not been provided in the discovery that was provided while I was absent, it will be provided, but we're asking -- going to be asking the Court for a protective order related to that because it involves a minor.

THE COURT: And the Court notes that as of today's detention hearing, that that audio and video recording is not available to the defender's office.

Q. (Mr. Ganter, continuing:) Now, there was -- you made reference to a second interview that you were privy to; is that correct?

A. Correct.

Q.   When did that occur?

A.   Sorry.  I'm looking at my notes.  February — I know it was February.  Like, February 8 or 9.  Hold on.

It was February 6.

Q.   And who was present at that interview -- well, let me ask this:  Where did that interview take place?

A.   At the CAC in Dothan.

Q.   So back at the CAC?

A.   Correct, uh-huh.

Q.   Who was present for that one?

A.   Myself, Tyler Harrington -- I'm not 100 percent sure -- I think there was a DHR -- someone from DHR there as well, and I do not believe -- Shelly Sanders did not -- she was not in the room with us.  She was not.  I know she wasn't.  She was — she was waiting in the lobby.  She was present at the building, but she was not observing the interview.

Q.   Okay.  Was that interview like the first one audio and video recorded?

A.   Yes.

Q.   And have you had an opportunity to review that?

A.   Yes.

MR. GANTER:  I assume, Mr. Duraski, that you will provide that as well as the other video?

MR. DURASKI:  We will with the same request for a protective order, Your Honor.

MR. GANTER: I'll just note for the record, Your Honor, we did not receive that video either.

THE COURT: And the Court notes that the defender's office -- the audio and video recording of that interview is not available to the defender's office for the use of today's detention hearing.

Q. (Mr. Ganter, continuing:) Now, when you were talking to C. S., you were talking about specifically her relationship with Grassroots; is that correct -- she told you about that; correct?

A. Yes, she did.

Q. And she told you where some of these allegations occurred; is that right?

A. Correct. To the best of her recollection, yes.

Q. Okay. And when she told you this, did she tell you that any of these specific incidents occurred on a military installation or at an Indian reservation or anything like that?

A. No. Just out of state.

Q. But she never told you about it happening at a -- on a military base or anything like that?

A. No.

Q. And she did tell you that when these allegations were supposed to have occurred, that she was -- how old? -- 14 or 15?

A. 14 or 15, yes.

Q.   So over the age of 12 obviously?

A.   Correct.

Q.   Now, you stated about -- you knew about a protective order; is that correct?

A.   Yeah.  Just from what had been provided to me via Shelly Sanders, yes.

Q.   And you knew that during this time leading up to the allegations that were made in January of 2019, there had been a problem between Grassroots and Shelly Sanders; is that right?

A.   Yeah.  I was aware there was some conflict there, yes.

Q.   And that the protective order -- and you were able to get text messages between some of the principals in this case; right?

A.   I was.

Q.   And there are text messages between Mr. Joyner and Shelly Sanders regarding C. S.; correct?

A.   Yes.  From what I've seen, yes.

Q.   And essentially Shelly Sanders was complaining that C. S. kept reaching out to folks from Grassroots; isn't that right?

A.   I haven't seen any texts that indicate that, but I do know they were in contact, yes.

Q.   Okay.  So Shelly then essentially wanted to end any relationship -- Shelly Sanders -- that C. S. had with Grassroots.  That was her goal; right?

A.   That's what it appeared to me, yes.

Q.   Now, you're familiar with a federal lawsuit; right? -- that -- correct?

A.   Yes.

Q.   And that was filed a pro se lawsuit that Mr. Joyner filed for essentially a civil rights violation against Ms. Sanders; is that correct?

A.   I'm aware of it, but I don't know the details.

Q.   But you know that it exists; right?

A.   Yes, I know that it exists.  But I've not looked at it or anything like that.

Q.   And that Shelly is named as a defendant and Larry Sanders is -- are named as defendants in that case; is that correct?

A.   Yeah.  Like I said, I'm -- I'm aware that there's some -- yeah -- between them, but I don't know any of the details.

Q.   All right.  Do you know the relationship of when that lawsuit was filed and when these charges came about?

A.   From what I -- again, from what I understand, it was sometime in late 2018.  That's -- that's -- yeah.

Q.   Okay.  So it is -- it's possible that these allegations came after Mr. Joyner essentially had filed his lawsuit against Ms. -- the Sanders; correct?

        MR. DURASKI:  Your Honor, I'm going to object to that question.  And he's asking her to speculate about a date, and he could -- in his case in chief, and he's already rested his case in chief.  If he wanted to get into this other lawsuit, he

could've. This witness has testified that she does not have personal knowledge, doesn't know anything about the lawsuit. What he's trying to do is bring in --

THE COURT: Mr. Duraski, this is cross-examination. The witness just testified that she believes the lawsuit was filed in late 2018. I'm going to allow it.

Q. (Mr. Ganter, continuing:) And you testified that the allegations came about in early 2019; correct?

A. Correct.

Q. Okay. So -- now, you did make reference to some of the comments from other individuals. I'm curious. How many folks did you interview -- students -- about these allegations that took -- supposedly took place at Grassroots?

A. D. S. and a M. S., yeah.

Q. And curiously D. S. -- isn't it true that D. S. told you that he didn't know anything about any sort of sexual allegations between C. S. and Coach Joyner?

A. Correct.

Q. And you said you interviewed M. S.; correct?

A. We did.

Q. And didn't M. S. say the same thing as D. S.?

A. She said she didn't -- she didn't see anything is what she said.

Q. Okay.

A. That's what she said. (Indiscernible).

Q.   So she didn't see anything; right?

A.   She didn't -- she did not personally observe anything.

Q.   Okay.  Well, let me ask you this:  Didn't D. S. and M. S. live at the Columbus address?

A.   Yes, they did.

Q.   And weren't they with them when they would go to -- on trips and tournaments and --

A.   I don't know if they were on every trip or tournament, but yeah, I mean, I know that they did go on trips and tournaments. I can't say it was every one, no.

Q.   And these folks lived at the Columbus address for three years, four years, didn't they?

A.   Yeah.  That's what D. S. said, it was about three or four years.

Q.   Okay.  Did you interview any other students?

A.   No.

Q.   So the only allegation, if I understand correctly, that you have is C. S.?

A.   Well, and D. S.

Q.   Let me ask you this -- well, D. S. said he didn't see anything between Coach Joyner and C. S.  You just testified --

A.   Yeah, but D. S. corroborated that himself and C. S. both engaged in oral sex at the request of Mr. Joyner to get out of chops.

Q.   Okay.  Well, let's talk about corroboration.  Okay?

You were able to find a white van; right?

A.    Uh-huh.

Q.    Okay.  So did anyone challenge that Mr. Joyner operated a white van?

A.    Well, I know -- I know he doesn't have a driver's license, yes.  Correct.

Q.    But there are other folks that are with Grassroots; is that correct?

A.    Right.  Spirit and -- uh-huh.

Q.    Do you have -- I saw in your discovery that there are subpoenas.

A.    Uh-huh (nodding head).

Q.    Obviously you had access to C. S.'s phone; is that correct?

A.    Yes.

Q.    Okay.  Is there anything in there that you saw which would suggest that was a text message or something like that from a number associated with Grassroots that was sexual or anything like that in nature?

A.    No.  We didn't have any of the content, and C. S. said that there -- C. S. told us that there was no sexual text messages, that Mr. Joyner never even really texted C. S.  Most of C. S.'s contact, if she was texting, was with Spirit.

Q.    Okay.  And you don't have any forensic evidence that --

A.    No.  She had switched phones.  She had changed phones.

Q.   Well, did you subpoena for old records?

A.   No -- well, we got the -- we got the historical, who -- which numbers were in contact with which numbers, yes.

Q.   And so you don't even have any -- do you have any forensic evidence that sex even took place?

A.   No.  No, DNA.  No, if that's what you're talking about.

Q.   Well, do you know any other kind of forensic evidence?

A.   No, that would be -- well, saliva and other -- yeah.  Yeah, but no.

Q.   Well, do you have any of that?

A.   No.  No.  No DNA, no.

Q.   And let me make sure I understand this.  When she reported this incident, that was in January of 2019; right?

A.   Correct.

Q.   And these allegations, according to your statement, indicates that they had been going on for years; right?

A.   Yeah.  She said the last time they had a -- if I'm recalling right -- the last time they had any type of sexual encounter would have been September of 2018.

Q.   And there is not one person or there is not -- let me strike that.

     You don't have any other independent evidence to support her claim?

A.   Her statement, and that's -- yeah.  Her statement, and we have records that they traveled, of course, out of state.

Q. Okay. And you also -- well, you were able to confirm -- I saw that you subpoenaed the records from the UTSA (sic), the --

A. Correct.

Q. -- United Tennis Association; correct?

A. Correct.

Q. And you were able to ascertain that there were a number of folks that traveled out of state; correct?

A. Correct, yes.

Q. Did he -- she ever tell you that she went on a tournament that she didn't want to go on?

A. Not that she didn't want to go on, no.

Q. Okay. So she willingly went to these tournaments; correct?

A. As far as I know.

Q. And she played in these tournaments; is that correct?

A. According to her, yes.

Q. And she also -- and there were a number of text messages where Coach Joyner would update the parents with regard to their students' performance; correct?

A. Correct.

Q. And that included Shelly Sanders; right?

A. Correct.

Q. There were times when Shelly Sanders was in those text messages -- where she was behind on her tournament fees for the -- for C. S.; is that correct?

A. Yes.

Q. And even the educational homeschooling fees for E. S.; is that correct?

A. Yeah. I do recall seeing those, yes.

Q. And it was sort of -- they were always playing catch-up, and Grassroots would extend them extra time to pay for the fees and become current; correct?

A. Yeah. From what I saw, yes.

Q. Now, I want to make sure -- after these allegations came about, weren't there a couple times in February that Ms. Sanders reached out to you to provide you information?

A. Yes.

Q. And you were able to get information after the protective order that C. S. was still contacting folks from Grassroots; is that correct?

A. If I recall, I remember them talking about it, how Shelly told her to make no -- don't contact them, but she had still contacted them some, yes, they -- they did corroborate that.

Q. And did you -- do you recall information where, actually, C. S. was apologetic, saying --

A. I don't remember -- I don't remember seeing those, no. But I will acknowledge that I know that they contacted, yes. I do know that.

        MR. GANTER: Your Honor, I'm finished.

        THE COURT: Mr. Duraski, any redirect?

MR. DURASKI:  No further questions for this witness, Your Honor.

THE COURT:  Special Agent Holt, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Mr. Duraski, you may call your next witness.

MR. DURASKI:  Your Honor, we'd call Probation Officer Terrence Marshall, please.

THE COURT:  And, Ms. Baxter, could you administer the oath, please.

TERRENCE MARSHALL,

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

THE COURT:  And, Officer Marshall, I'm going to give you the same instruction that I've given the other witnesses, that the oath applies just as if we were in my courtroom rather than by VTC today, and you should conduct yourself just as if we were in court.

THE WITNESS:  Yes, sir.

THE COURT:  Well, we are in court.  Let me correct my statement.  By video teleconference.

You may proceed.

DIRECT EXAMINATION

BY MR. DURASKI:

Q.   All right.  Good afternoon, Officer Marshall.  Would you please state your full name and spell your first and last name for the record.

A.   Terrence Marshall, T-e-r-r-e-n-c-e, capital M-a-r-s-h-a-l-l.

Q.   Okay.  And, Officer Marshall, where are you employed?

A.   I'm a United States probation officer.

Q.   And in the course of your employment as United States probation officer, have you had an occasion to prepare what is called a pretrial services report regarding Leroy Thomas Joyner, Jr.?

A.   Yes, sir, I did.

Q.   Have you provided a copy of that report to the Court?

A.   I have, yes, sir.

Q.   Okay.  And a copy to Mr. Ganter, the attorney for Mr. Joyner?

A.   Yes, sir, I have.

Q.   And a copy to me; is that correct?

A.   That's correct, yes, sir.

Q.   And do you have a copy of it in front of you there where we can talk about it?

A.   I do.

Q.   All right.  I'm going to ask you -- first of all, let's look at page -- well, first of all, let me ask you this:  In doing the records and preparing the report for Mr. Joyner, did

Q. you determine whether or not he had any prior criminal record?

A. I did.

Q. Okay. Does he have any prior criminal record that you're aware of?

A. He does not.

Q. Okay. And did you do your usual interview regarding substance abuse or drugs or alcohol -- that sort of thing?

A. Yes, sir, I did.

Q. Do you --

A. Via telephone.

Q. Do you consider that he has any drug or alcohol problems?

A. No, sir, he does not based on my interview.

Q. All right. Now, let me ask you to look at page 1 of your report there -- well, first of all, how many pages is your report total?

A. A total of four pages.

Q. Okay. And you completed this report after interviews with Mr. Joyner and his family and doing records check; is that right?

A. Yes, sir, interview with him and -- and a telephone verification with his wife.

Q. Okay. Did you locate what would typically be a permanent home address for him?

A. Well, when I interviewed him, he -- at the time, before the interview the -- Mr. Thomas had indicated -- Joyner

indicated that he had stayed in an Extended Stay in Florida for about a --

Q.   Okay.

A.   -- a month prior to that interview.

Q.   Okay.  And if you'll turn to page 2, in the second sentence up there, there's an Extended Stay and an address.  Is that the Extended Stay that he told you about?

A.   That's correct.

Q.   Okay.  So he had been living there temporarily?

A.   For one month, approximately one month.

Q.   Okay.  And back to page 1, there's a block that says "Address."  Do you see that?

A.   That's correct.  The Columbus, Georgia, address.

Q.   Okay.  Well, whose address is that?  Is that his home address?

A.   He indicated to me prior to the one month in Florida at the Extended Stay, he had previously stayed five -- approximately five years at that Columbus, Georgia, address. He and his wife -- he had a verbal agreement or relationship with the owner that he could return to that address at any time.

Q.   Okay.  So he's staying in Florida, but he's got another address in Columbus; is that right?

A.   He had previously stayed there for five -- five years.

Q.   Okay.

A.    If he had to go back, he could.

Q.    Okay.  And he's got family members that are living in different places in the Southeast according to the bottom paragraph of the report.  Where does his mother live?

A.    His mother?

Q.    On the bottom of page 1, that paragraph is what I'm looking at.

A.    Exactly.  His mother, from my understanding, she lives in St. Helena Island, South Carolina.

Q.    Is she still there?  Do you know?

A.    That's what he said.

Q.    Okay.  Where does his father live?

A.    His father he said lived in Miami, Florida.

Q.    Okay.  So then he lists some siblings that live in other states.  Where do they live?

A.    There was one sibling I remember that was incarcerated.  And --

Q.    (Indiscernible.)

A.    -- there was one, Summer Jones, who lived in Greenville, South Carolina.  There was a Samuel Jones who is incarcerated and a Napoleon Joyner who lived in the same location with his mother in St. Helena Island, and there was a Valentino Joyner who lived in Charlotte, North Carolina.

Q.    Okay.  I'm going to ask you to turn to page 2 of your report.  About the middle of the page there, you show some

Q. children of Mr. Joyner. Do you see that?

A. Yes, sir.

Q. Okay. Now, these people that are listed here all have a different last name than Mr. Joyner, but are those his biological children?

A. That, I -- when I asked the question as to how many kids he had, those -- there wasn't any whether or not it was biological or if they were stepchilds -- stepchildren.

Q. All right.

A. So I took it that he came into a marriage with a wife that had children.

Q. Okay. But he considers these individuals his children?

A. That's correct.

Q. Okay. And they all reside outside of the State of Alabama in Orlando, Florida; is that right?

A. That's correct.

Q. Okay. I'm going to ask you to turn to page 3 of your report. At the bottom of the page, you have a note there about a protection order --

A. Yes, sir.

Q. -- issued in Dale County. Have you actually seen that protection order?

A. Well, part of my investigation is to do a criminal records check on the defendant. At which time, I did one through the Atlas system, and it revealed a domestic -- a protection order

that had been issued on the defendant by a Shelly Sanders.

Q.   Is it called a protection from abuse order, or what's it called?

A.   It's protection order.

Q.   Okay.

A.   That's the way it came up in the system, protection order.

Q.   All right.

A.   I looked --

Q.   I'm sorry.  Go ahead.

A.   I looked in the other sources -- Alacourt and AlaCOP -- and I could not find any copies of it under his name.

Q.   Okay.  I see some language there.  It says that it's "ordering the defendant" who, in that case, would have been Mr. Joyner "to restrain from assaulting, threatening, abusing, harassing, following, interfering, or stalking the complainant, Ms. Sanders."

Where did that language come from, the assaulting, threatening --

THE COURT:  There's an objection before the Court.

MR. GANTER:  Your Honor --

THE COURT:  (Indiscernible) Mr. Ganter.

MR. GANTER:  Mr. Duraski is just simply reading the report into the record.  If he has a question, I'd wish he'd pose it to the witness.

MR. DURASKI:  I think I, in fact, did pose it.  I

asked him where that language came from. That's why I was reading it was to ask where that language came from.

THE COURT: And the objection is overruled.

And you may answer the question.

MR. DURASKI: Okay.

A. That language came directly from the protection order printout received by myself through the investigation -- my investigation.

Q. (Mr. Duraski, continuing:) All right. So that is not your language; that's the Court's order language?

A. That's the language that was placed in the order when filed by Ms. Shelly Sanders.

Q. Okay. Was that court order issued by the Ozark county -- or the Ozark Circuit Court? Do you know?

A. Origination is Dale County sheriff office, Ozark, with a telephone number.

Q. All right. And again, Mr. Joyner has no criminal record or (indiscernible) indication in your report, but do you have a recommendation for the Court? Is it typical for you to do a recommendation regarding detention?

A. Yes. As noted in page 4 of my report, for those. There is an assessment and -- appearance and an "Assessment of Danger." My recommendation because of those reasons is detention.

Q. Okay.

MR. DURASKI:  Your Honor, I have no further questions for Mr. Marshall at this time.  I would ask that the report be admitted under seal as a court exhibit.

THE COURT:  And is there any objection to admitting the pretrial services report as Court Exhibit Number 1 under seal?

MR. GANTER:  Based on the existing law in this district, I will not object, Your Honor.

THE COURT:  Then it is so admitted.

And you may proceed with cross.

CROSS-EXAMINATION

BY MR. GANTER:

Q.   Mr. Marshall, let's start with page 4.

A.   Okay.

Q.   In your "Assessment of Nonappearance," you have one reason, and it says "offense charged"?

A.   Yes, sir.

Q.   And so you don't have any other reasons listed here that you've entered into your calculus as to why he might constitute a flight risk, do you?

A.   For that — that reason only, the statute and because of the -- the offense that he's charged with.

Q.   Okay.  So you don't have any prior court dates that he's missed?  Evidence --

A.   None.  Not at all, no, sir.

Q.   And do you have any evidence that he has a passport?

A.   My interview with Mr. Joyner, he indicated he did not have a passport and never traveled outside the country.

Q.   Okay.  And so do you have any evidence that -- you know, typically there are individuals who -- when you might recommend that they're a flight risk, they may have actually violated court orders or not shown up; is that correct?

A.   As far as the assessment for nonappearance?

Q.   Yes.

A.   If it's related to a criminal case, yes.

Q.   Okay.  Now, for "Assessment of Danger," you have four reasons; right?

A.   Yes, sir.  Yes, sir.

Q.   You have the "Nature of the instant offense."  Okay?

A.   Yes, sir.

Q.   And then you also have "Charge involving a child," but that's kind of like the instant charge; right?

A.   Well, the indictment lists all of that, so in the statute and the -- the Statute 31-, you know, 42, plus it's charged as 109 -- Chapter 109 offense, which is a sexual abuse sex offense.

Q.   So -- but the nature of the instant offense involves a charge involving a child; correct?

A.   2241(c), yes, with children.

Q.   And the charge also involves a sex offense; is that

correct?

A.    That's correct.

Q.    Okay.  So one, two, and three are all -- your reasons all stem from the instant charge; is that correct?

A.    From the statute and the -- the indictment as read.

Q.    Okay.  Now, when you prepared this report, what did you know about the case?

A.    That it was a sex offense, sex -- involving sexual abuse involving a child and --

Q.    So you read the indictment?

A.    Yes, sir.  And read the statute.

Q.    Okay.  So you read the indictment and the statute, but did you know anything about the facts of the case?

A.    Only a small portion of it as far as it involved a tennis coach and --

Q.    That's it?

A.    -- a teen- -- a minor who -- who played for him, yes.

Q.    Okay.  And you've been privy to the presentation of evidence today; is that correct?

A.    That's correct, I have.

Q.    And the presentation of that evidence -- you listened to the FBI special agent testify, didn't you?

A.    That's correct, I have.

Q.    And did you hear the agent testify that there was any force that was used in the commission of this offense?

A.    Not that I can recall.

Q.    Okay.  So it would seem that the evidence that you've been presented with here didn't necessarily match up with the indictment that you read prior to this hearing; correct?

A.    If you're looking at the fourth part, yes.

Q.    Okay.  So would it suffice it to say that this report that you prepared in advance of this hearing -- I received it yesterday afternoon -- you did not know the same or all the information that you do -- you now know; is that correct?

A.    I did not.

Q.    All right.  And having heard the information, does that change your position?

A.    That's -- you know, my recommendation, of course, you know, is -- is detention, and that's -- you know, that's the rebuttable presumption.  And the weight of the evidence will be viewed by the Court, and the Court will eventually make a decision on that.  So you're asking me to look at the weight and -- but my recommendation has not changed.

Q.    That's okay, Mr. Marshall.  I think you answered my questions.  Thank you.

        MR. GANTER:  I have nothing further.

        THE COURT:  Any redirect, Mr. Duraski?

        MR. DURASKI:  No further questions for Officer Marshall, Your Honor.  The Government rests.

        THE COURT:  And, Mr. Marshall, you may step down.

THE WITNESS: Thank you, Judge.

THE COURT: Are we ready to proceed with argument, or would you like to take a brief recess before argument?

MR. GANTER: I'm ready to proceed with argument, Your Honor.

THE COURT: Okay. And --

MR. DURASKI: I'm ready, Your Honor.

THE COURT: -- because it's Mr. Ganter's burden, this is a presumption case, you may go first.

MR. GANTER: Your Honor, hopefully you received the exhibits that we provided this morning.

THE COURT: I have. Though I didn't note you admitting them at any point.

MR. GANTER: (Indiscernible) I think Mr. Duraski has a copy, and we would like to offer those in as Defendant's Exhibit 1 into evidence -- and 2. They are jury instructions that address the charge here 22 --

THE COURT: Mr. Duraski, do you have any objection?

MR. DURASKI: Your Honor, I did not receive these exhibits before this hearing began, so I -- I'm not sure what their relevance is, but -- they're jury instructions. This is not a jury trial, and it's not a jury burden, but if Your Honor wants to consider them, I have no objection.

THE COURT: I'm going to --

MR. GANTER: Well --

THE COURT:  I'm going to admit them, and I have them in front of me.  So Defendant's Exhibits 1 and 2 are admitted.

MR. GANTER:  Very well, Your Honor.

One of the issues for this Court in determining whether or not detention is appropriate is to ascertain whether or not -- the strength of the case here.  I think we have essentially sort of jumped one hurdle in that analysis, and I think the Court inherent in that sort calculations needs to ascertain whether or not there's even a crime here.

I think what the Government has done is they've done conflated two sections of 2241, and in doing so -- and I think the jury instructions bear this out, and the instructions also say that the issue at hand is one of a matter of law.  There is no jurisdiction in this case.  The evidence that came out today, if they are to be believed from C. S., is that she was 14, 15 years old and that she allegedly had sex in places, including Alabama and maybe even out of state, but that does not confer jurisdiction for 2241(c).

2241(c) consists of two offenses, and those offenses are the following:  An individual who travels across state lines and engages -- with the intent to engage in sex with someone under the age of 12 can be culpable.  Then it goes on and it talks about whether or not -- the first part of 2241(a) and/or (b).  In (a) -- subsections (a) and/or (b), both of those provisions require special maritime and/or territorial

jurisdiction. That was the reason why I asked the special agent here whether or not these offenses occurred on military bases, Indian reservations, places where the federal court could assert jurisdiction on these types of offenses. They indicated they did not.

So they don't even have evidence that this Court has jurisdiction. Beyond that, there is no evidence -- and I think Mr. Marshall conferred this in listening to the agent testify today -- that there was a force, which is a part of the charge. Even if 22- -- this charge were to survive, there is no evidence that there was any force, and there's no evidence, quite frankly, that there was any sex.

Ms. McLendon testified at length that she had been a part of this, essentially Grassroots, for a number of years, and in her capacity as team mom, she never saw anything inappropriate between Coach Joyner and C. S. Additionally, the special agent went out and interviewed other folks, and they never said that they saw anything inappropriate between Coach Joyner and C. S.

It really appears that this was a civil misunderstanding between Shelly Sanders and the Grassroots Community and essentially exploded into these charges. Beyond that, there is no evidence to support these charges, and because there is no criminal history here, there is nothing that constitutes -- that Mr. Joyner constitutes a flight risk.

He had turned himself in.  He actually came from Florida up here to turn himself in.

He indicated that if the Court were inclined to release him, that he could -- and he couldn't go back to Florida, that he could go back to Columbus and that there is a residence there.  So -- and there's nothing to suggest that he would not comply with this Court's order.

Now, if the Government, I guess, persists with this charge in light of the fact that they don't have jurisdiction, then there's nothing that says that he can't be tethered to an electronic monitoring device, and the Court can keep a watchful eye.  But he should not sit in jail because some charges came under some curious circumstances, a number from conduct that allegedly occurred a number of years ago, and that's not corroborated in any other way.

So we would ask -- we propose to the Court that we have met our burden, we have exceeded, and even though that's sort of difficult to do from the rebuttal presumption perspective, we've done that here and that you release Mr. Joyner.  Thank you.

THE COURT:  I need to take a brief recess to plug in my commuter, which just gave me a signal that I'm running low on battery.  So I'm going to take a brief one second (audio disruption).

(A recess was taken at 12:43 p.m.)

THE COURT: All right. The Court has got its power issue solved, and we are now in session.

Mr. Duraski, you may proceed with argument.

MR. DURASKI: Thank you, Your Honor. Am I off mute? Can you hear me?

THE COURT: The Court can hear you.

MR. DURASKI: Okay. I wasn't sure. It looked like it was still muted there for a minute.

Your Honor, let me just begin in terms of whether or not there's any evidence that this crime was committed. Unfortunately, in circumstances like this, often times we are limited to a victim claiming that something happened to them. In this case, you had a impressionable teenage girl who had a terrible family life who then became in a situation where her parents were not involved in her life very much with this tennis coach that created and presented to Leroy Joyner a vulnerable victim, a person that could be taken advantage of without anybody really noticing because nobody was noticing her.

(Indiscernible) he began to pay attention to her. He groomed her, and he eventually had sexual intercourse with her. Maybe the only evidence in this case can come down to C. S.'s word, but we do have C. S.'s word. But beyond that, we have confirmation that C. S. traveled out of state with Coach Joyner to Columbus and Louisiana and Mississippi. We have

Ms. McLendon's own word that stuff like that was going on, but C. S. described --

THE COURT: Mr. Duraski, I hate to interrupt counsel in the middle of argument, but I do have some questions that I'm going to ask when you're at that point.

You mentioned out of state travel. Mr. Ganter has argued that the crime charged requires that it take place in special maritime or territorial jurisdiction in the United States. What is the Government's position on that?

MR. DURASKI: Your Honor, we disagree with that reading of the -- the statute says whoever crosses the state line with intent to engage in sexual act with a person who has not attained the age of 12, and then you jump down through there, there -- the crossing the state lines with a 12- to 14-year-old is another way this offense can be committed.

So we believe that under the law, taking a 12- to 14-year-old out of the state is crossing state lines, makes it jurisdiction, that there is federal jurisdiction when you take that person out with the intent to engage in sexual conduct with that person if they are 12 to 14 and the actor is more than four years older than them. That is a part of the offense that he didn't talk about.

Within that case, this case is established that Coach Joyner was more than four years older than her -- than C. S. when he took her across state lines for the purposes of

having sex. We do believe that jurisdiction is met in this case, and of course, in district court, we can address that further, but for purposes today, we believe that fundamentally there's enough evidence to support the charge based on crossing the state lines with a person 12 to 14 when the actor is more than four years older.

In addition, Your Honor, we also believe that there is some evidence of threat and violence. The talk of the -- the FBI talked about the chops being received and that two children were forced to have sex in the presence of Mr. Joyner in order to avoid the chops and avoid that. We believe C. S.'s testimony would be that that was part of this whole thing, was the chops, the paddlings, was a part of the way of grooming her and eventually coercing her into having sexual relations with him.

He broke down her will by both paying her the attention that he paid her, the threats of violence that were directed through these boards that were used on the students, and coercing her to have sex with other students. The question remains of whether or not he would be a flight risk or a threat to the community in terms of detention.

It's established beyond any controversy that he has an address in Columbus, Georgia. He was living in Florida. Sure, he turned himself in today, but he's got family members all over the Southeast. If things started not going his way, it

would be easy for him to find someplace outside of the jurisdiction of this Court to secret himself with a family member, another residence, an Extended Stay, and we believe that those elements -- and that's why we ask about that of every witness about these addresses outside of the State of Alabama -- and his propensity to travel with (indiscernible).

And interestingly enough that Mr. Ganter made an argument, made a point about the allegations coming after a civil lawsuit had been filed by Mr. Joyner against C. S.'s mother, but his lawsuit was filed after the district court lawsuit. So -- or the State of Alabama lawsuit. So if you want to talk about a progression of things, it seems to me that it's a reasonable inference, from the way this thing laid out in terms of a time frame, that Mr. Joyner brought his action because he knew the gig was up. He knew that he was being exposed. A protection from abuse order had been issued by the state courts of Alabama for a good reason, and then he files a civil suit.

So he's trying to head this off at the pass by bringing in some sort of pro se lawsuit that, A, accuses Ms. -- C. S.'s mother of some sort of civil rights violation. And of course, if we go back to Ms. McLendon's testimony that she claims that this was all racially motivated, that a black man couldn't punish a white child in Dale County. So it's, again, setting up that defense appears to be part of the line here for

Mr. Joyner.

He has taken this position by bringing the civil action that to be aggressive is forestalled in the accusations that he knew were coming. Certainly C. S. didn't tell when she should have told, but she was an impressionable, vulnerable victim being taken advantage of by Mr. Joyner. And that, I believe her testimony is entitled to be given credibility.

She has told that story consistently once it was (indiscernible). She didn't want to. Whatever her infatuation -- and that's Ms. McLendon's word -- her infatuation with Coach Joyner might have precluded her from being able to see what was happening to her, but the fact remains. This is a 30-something-year-old tennis coach taking sexual advantage of a 13-, 14-, 15-year-old child in his care.

That child is entitled to be believed at this point, and it's not necessary for her to testify in person at a hearing such as this. But the FBI agent's testimony is uncontroverted that that's what the child says had happened to her and that she was taken out of state and that these things happened to her.

And further we're talking about Ms. McLendon's testimony. I mean, it's clear that she's a supporter of Coach Joyner and she believes in him, and thank goodness it appears that nothing improper happened to her daughter. But, Your Honor, I personally find it incredible to believe that

she -- when she tells us that she knows every person who ever went to the house in Columbus, Georgia, and that he doesn't have any other friends other than friends that she knows. Clearly C. S. could have been taken to that house in Columbus, Georgia, and subject to sexual abuse at the hands of Coach Joyner and Ms. McLendon never know about it. There was at least a four-month period of time -- January, February, March, and April -- of early 2018 when unfortunately for Ms. McLendon her mother was ill and she wasn't traveling with the team, and Coach Joyner could have, and according to C. S., did take her out of the state and had sex with her in other states other than this one.

Given the nature and ability of this man to move around the Southeast to various addresses with various family members, opportunities to go different places, the facts that C. S. lays out in her statements to the FBI agent and to the CAC individuals, the threat that he poses at least to C. S. in ongoing litigation with her family -- who knows how that might stir him into further action towards them -- all of those elements taken into account, Your Honor, we believe that the detention recommended by Officer Marshall would be appropriate in this case.

THE COURT: Thank you, Mr. Duraski.

Mr. Ganter, I'll allow rebuttal.

MR. GANTER: Thank you, Your Honor.

Defendant's Exhibit 2 -- addressing Mr. Duraski's argument about jurisdiction is conferred because it involves some sort of crossing interstate lines. That is not one of the elements of aggravated sexual abuse because 2241(c) makes specific reference to (a) and (b), subsections (a) and (b), to be convicted of 2241(c), when the act occurs between the age of 12 and 16, it makes it clear there must be special maritime jurisdiction or within the territorial jurisdiction of the United States or in a federal prison or agency.

That is not -- that is totally lacking here, and he can spin 2241(c) and conflate the subsections all he wants, but they have not met that element of the offense.

Going to the speculation from Mr. Duraski regarding Mr. Joyner. I don't see any reason why someone who was out and they were facing this case would run from it. This is a case that you meet head-on and you take it right to trial and you let a jury decide these facts. No one is going to run from this because all of the evidence basically is in.

The Government cannot meet their burden and they cannot prove it if this case goes forward to a trial. So there's no reason to run. He's being punished because he doesn't -- because he has family members that live in the Southeast. That's essentially what -- he constitutes a flight risk because he has family members that live in the Southeast. But there are -- folks are released on bond all the time who

have family members, and there are other conditions that you can put in place, like putting an electronic monitoring device on him. There is no reason that that can't happen.

And what he is also talking about is talking about what -- the state of the evidence here. He keeps referring to "we believe" or "we think this happened" or -- this was the opportunity to present that evidence, and they did not present it. There is nothing in his background which supports that he's a flight risk and/or a danger to the community. He does not have any criminal history. None.

And as I mentioned earlier and I think the FBI agent even told the Court, he drove himself here and turned himself in once he got notice of the charge from Florida. He didn't wait for the marshals and fly ConAir back here. He did it on himself. There's no reason to believe that he should be locked up, that he will not show up at court appearances, and he will not vigorously contest these allegations should the Government go forward. Thank you.

THE COURT: Thank you, Mr. Ganter.

I'm going to take a brief recess to consider the evidence and the arguments, and then I'll give you my ruling.

We are in recess.

(A recess was taken at 12:57 p.m.)

THE COURT: The Court is again in session. I'm going to check communications again.

First, Ms. Baxter, can you hear me?

COURTROOM DEPUTY: Yes, sir.

THE COURT: Mr. Duraski, can you hear me?

MR. DURASKI: Yes, sir, I can hear you. Your image is frozen on the screen, but I can hear you.

THE COURT: All right. On my end --

COURTROOM DEPUTY: He's fine. You're moving on my end.

THE COURT: Okay.

Mr. Ganter, can you see and hear me?

MR. GANTER: I can see and hear you, Your Honor.

THE COURT: And, Mr. Joyner, can you see and hear me?

THE DEFENDANT: (No response.)

THE COURT: Mr. Joyner, apparently you're muted.

COURTROOM DEPUTY: Let's see. Let me unmute him.

THE DEFENDANT: Can you hear me now?

THE COURT: Yes, Mr. Joyner. Can you see and hear me?

THE DEFENDANT: I can hear you now.

THE COURT: Okay. Then we will proceed.

Having considered the evidence and the arguments made in the detention hearing today, I find that the defendant has met his burden of overcoming the presumption of detention with credible evidence. Considering the nature and circumstances of the alleged offense and the weight and circumstances of the evidence against Mr. Joyner, I find that there are conditions

available to the Court that will reasonably assure his presence at trial and the safety of the community.

I'm going to order that he be subject to location monitoring and that he arrange to live at the address provided in Columbus, Georgia. If he cannot -- he will not be released until that address is ready and that he can move there. If that address does not work out, he must find an address -- a suitable address for -- address suitable to pretrial services in -- within the Middle District of Alabama.

Mr. Joyner is forbidden from work -- any work with minors. He's, of course, forbidden from any and all contact with C. S. and her family. The precise terms of the bond are being worked on now. When the written bond is completed, it will be forwarded to the Court for review and to defense counsel for review with the defendant.

So, Mr. Marshall, when do you anticipate the bond being prepared for the Court's review.

MR. MARSHALL: Judge, within a few minutes.

THE COURT: Okay. So this will require a delayed release of Mr. Joyner until those conditions imposed by the Court with respect to -- where he is living are satisfied.

Mr. Ganter, do you understand that?

MR. GANTER: I do, Your Honor.

THE COURT: Okay. And you'll discuss that with your client?

MR. GANTER:  I will, Your Honor.

THE COURT:  Okay.  So when the Court receives the bond paperwork and reviews it, I'll circulate it to counsel for review with your client.

MR. GANTER:  Very well, Your Honor.  Thank you.

THE COURT:  Is there anything further the Court needs to take up today?

MR. DURASKI:  Nothing for the Government, Your Honor.

THE COURT:  And, Mr. Ganter?

MR. GANTER:  No, Your Honor.

THE COURT:  Okay.  Then we are adjourned.

MR. GANTER:  Thank you, Your Honor.

(At which time, the Court adjourned at approximately 1:15 p.m., Central.)

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

This 30th day of June, 2020.

/s/ Katie Silas

Official Court Reporter

Register Professional Reporter

KATIE SILAS, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, Alabama 36104  (334)315-0363